[No. 52134–4.   En Banc.   November 19, 1987.]

F. CRAIG STUART, ET AL, *Respondents,* v. COLDWELL
BANKER COMMERCIAL GROUP, INC., ET AL,
*Appellants.*

*Davis, Wright, Todd, Riese & Jones,* by *Duncan A. Bayne,* for appellants.

*Hanson, Zwink, Baker & Ludlow, P.S.,* by *John W. Martin, Jr.,* for respondents.

U TTER , J.—The trial court in this case awarded damages to a homeowners association against a builder–vendor for construction defects in common and limited common areas of a condominium complex. The action was brought more than 3 years after the builder–vendor sold the last condominium unit, and many of the units changed hands before suit was filed. The applicable statutes of limitation properly should have barred many of the plaintiffs' actions. We hold that the trial court incorrectly applied the discovery rule for determining when plaintiffs' causes of action accrued.

The trial court greatly extended the implied warranty of habitability beyond the contours defined by this court. The trial court also recognized a new cause of action to this jurisdiction in negligent construction. This court cannot allow sympathy for the plaintiffs to lead to the creation of a logically inconsistent and vague theory of recovery that fails to provide useful precedent. Accordingly, we reverse and remand.

Yarrowood is a condominium complex located in Bellevue. One hundred forty–four of the 155 units have private decks. Because of the steep topography and siting, there are 32 entry walkways which traverse from the parking area to provide access to unit entrances. Twenty–three of these serve only one apartment each. The bulk of the areas at issue were these private decks and walkways.

The Declaration of Condominium (as amended) provides that private decks off individual apartments are "limited common areas", to which the individual apartment owner has exclusive access. The individual homeowners are solely responsible for their maintenance. Certain access walkways are also limited common areas, although the Declaration of Condominium does not specify precisely which walkways. The trial court found all these areas were "common areas," "regardless of the subclassification of the private decks as 'limited common areas'" (Finding of fact 15; Clerk's Papers, at 15) as that term is used in the Declaration of Condominium and by statute. *See* RCW 64.32.010(6)(b),[1] (11).[2]

The original developer, Ferguson Development Company and related corporate entities started work on the project in 1973. Ferguson intended to develop the complex in phases, and hired architect El Baylis to design the entire complex. After experimenting with various railing designs for the private decks and walkways, Ferguson adopted a wooden frame closed rail system. This involved the construction of a wall approximately 40 inches high, made of two–by–four studs enclosed on both sides with siding and gypsum board. The wall is capped by a wooden rail and joined at the bottom to the horizontal surface of the deck.

In May 1975, when Phase I (67 apartments) was partially constructed, Ferguson defaulted and Coldwell Banker took over. From that point, Coldwell Banker was the owner, developer, construction contractor and vendor of the apart-

---

[1] RCW 64.32.010(6)(b) provides, in pertinent part:

"(6) 'Common areas and facilities', unless otherwise provided in the declaration as duly recorded or as it may be lawfully amended, includes: . . .

"(b) The foundation, columns, girders, beams, supports, main walls, roofs, halls, corridors, lobbys [sic], stairs, stairways, fire escapes, and entrances and exits of the building;"

[2] RCW 64.32.010(11) provides, in pertinent part:

"(11) 'Limited common areas and facilities' includes those common areas and facilities designated in the declaration, as it is duly recorded or as it may be lawfully amended, as reserved for use of certain apartment or apartments to the exclusion of the other apartments."

ment units at Yarrowood.

When Coldwell Banker took over the project it hired architect Baylis to inspect and assess the project. Baylis informed Coldwell Banker that the decks and balconies were not adequately flashed at wall and/or rail junctures. In at least one instance a deck had no way to drain and would probably rot. In September 1975, Baylis notified Coldwell Banker that standing water on the flat asphalt roof of the largest building in the complex would lead to problems unless corrected. In response and as leakage became apparent and complaints were made, Coldwell Banker took corrective steps to repair or replace each of the Phase I decks that were called to its attention. Nonetheless, the trial court found the repairs and other construction changes made were ineffective to eliminate all of the problems.

Coldwell Banker completed Phase I by mid–1976. The City of Bellevue Building Department issued a certificate of occupancy on June 10, 1976, although purchasers had occupied a number of units from late December 1975.

In March 1976, Coldwell Banker contracted with architect Baylis to prepare construction drawings for Phase II, which added an additional 88 apartment units. Coldwell Banker instructed Baylis to make design changes in the walkway and deck assemblies in an attempt to avoid the problems experienced in Phase I. Phase II construction began in 1976, and on September 15, 1977, Bellevue issued a final certificate of occupancy. The last unit was sold in February 1978, some 4 years and 9 months before the commencement of the lawsuit in November 1982.

Coldwell Banker turned over management of Yarrowood to the Board of Directors of the Yarrowood Homeowners Association (the Board) after substantially all of the units were sold. Following a short period in which Coldwell Banker acted as property manager, the Board hired a resident manager to handle complaints from homeowners, and to perform minor maintenance and repairs. The first manager served from early 1978 to 1980. During 1978 and 1979, he received complaints relating to 10 to 15 of the decks at

Yarrowood. Some of the decks had damage which was plainly visible from public areas such as the parking lot for one of the buildings.

By June 1979, at least one deck had so deteriorated that the homeowner asked the Board about having it rebuilt. In connection with this and other complaints being received, the Board contacted an attorney for advice on who was responsible for repairing the deteriorating decks. The Board described the problem to the attorney as a design defect. After reviewing the Declaration of Condominium, the attorney responded that in his view the responsibility for repair and maintenance of these limited common areas lay with the individual homeowners, rather than with the Board.

The Board relayed the attorney's advice to the homeowners, and took the position that these defects were not the Board's responsibility. Some of the Board members had initial leakage problems which Coldwell Banker had worked on. In fact, the majority of the nine members of the Board in the years 1979 and 1980 knew during or before their service on the Board of leakage problems on Yarrowood decks.

In November 1980, the Board contacted a second attorney for his opinion on repair responsibilities. This attorney advised if the problem was a construction defect then the Board, rather than the individual homeowners, should pursue claims against the developer on behalf of the common ownership. Upon receiving this advice, the Board specifically asked the homeowners to lodge their complaints with the Board's resident manager. A number of such complaints were formally registered before the next meeting, which took place on December 18, 1980.

In November 1982, the members of the Board filed suit in their representative capacities on behalf of both original and subsequent purchasers of affected units against Coldwell Banker, El Baylis, and Ferguson.[3] The suit alleged

---

[3]Coldwell Banker cross–claimed against Baylis for recovery in the event of a finding of liability for negligent design. Both plaintiffs and Coldwell Banker

defendants were liable under theories of negligent construction, breach of express and implied warranties, misrepresentation, and violations of the Consumer Protection Act, RCW 19.86.

As of that time, 74 out of the 155 units had changed hands from the original purchasers to subsequent purchasers. By May 1984, the month of trial, the number of units owned by subsequent purchasers had risen to 81, constituting a majority of the units in the complex.

The trial court found plaintiffs' suit was timely brought within the applicable statute of limitations, reasoning that the claims accrued at the December 18, 1980 meeting, when the Board had notice that the deck and walkway problems were widespread throughout the project. The court found that

> Although plaintiffs received some isolated complaints from unit owners of water leaks and stains with respect to the private decks attached to the unit, there was not a sufficient number of complaints or sufficient quality of the complaints received to indicate a project–wide problem with substantially all decks and the degree to which the decks were affected until December 1980.

Finding of fact 30; Clerk's Papers, at 20–21.

The court held there was no liability under the Washington Consumer Protection Act, nor under plaintiffs' theory of breach of express warranty or misrepresentation. Plaintiffs have not appealed those rulings.

The court noted that the applicable provisions of the uniform building code and industry standards required that the decks, balconies, walkways, ramps, and stairway structures be constructed in a watertight manner. It found, however, that the areas were not so constructed, and allowed water to penetrate from the time of original construction. These defects, both latent and patent, the court held, led to rotting and the substantial impairment of the structures.

---

dropped their claims against Baylis prior to trial. Ferguson apparently went through bankruptcy proceedings some time prior to trial.

The court found that rotting conditions between initial occupancy and 1980 were known by the homeowners, who complained to Coldwell Banker, which responded to all complaints by making repairs and replacements. It found, however, that the complaints were not in every case communicated to the Board.

A determination was made by the court that the defective conditions were caused by negligent construction practices which left

> the largest majority of the affected structures in Yarrowood unfit for their ordinary and intended purpose and dangerous to use within a very short time after their construction. . . .
>
> Although structurally safe for the buyer's intended purpose at the time of construction and initial purchase by individual owners, a number of the private decks, balconies and walkways became unsafe through the action of dry rot from water trapped as a result of construction defects.

Findings of fact 19, 20; Clerk's Papers, at 18. It held that both the original and subsequent purchasers could recover for the entire damages to common areas and limited common areas under a negligence theory, and that the original owners could also recover under implied warranties of habitability.

Coldwell Banker, as owner–developer–builder–vendor of the complex, which was constructed for sale to the general public, was determined to owe a duty of proper construction, a duty which includes the nonnegligent construction of elements within the common and limited common areas. The court further held that no privity of contract need exist in order for Coldwell Banker to be liable for damages caused by negligent performance of its contractual duty.

Coldwell Banker was also held to have impliedly warranted to the original purchasers that the common and limited common areas were fit for their ordinary and intended purpose, that the applicable building code provisions were complied with and that the construction was performed in a proper and workmanlike manner with

respect to building methods, techniques, or materials used. The court concluded that Coldwell Banker breached the implied warranty of habitability (thus defined), and was liable to plaintiffs for damages sustained as a proximate result of this breach.

Of the $378,758 in damages awarded by the trial court, $87,680 represented repair costs to private decks which were limited common areas exclusive to units owned by subsequent purchasers. No separate finding was made with respect to walkways for which damages were awarded, but which serve secondary purchasers' units.

Three issues are raised on appeal: (1) whether the trial court correctly determined the time the plaintiffs' causes of action accrued for purposes of the discovery rule; (2) whether the court properly applied the implied warranty of habitability theory as developed by our courts; and (3) whether the trial court erred in recognizing a new cause of action in negligent construction.

STATUTE OF LIMITATIONS

Coldwell Banker acknowledges the Board's standing to sue on behalf of two or more individual condominium owners with similar claims pursuant to RCW 64.32.240. That statute provides, in part:

> Without limiting the rights of any apartment owner, actions may be brought as provided by law and by the rules of court by the manager or board of directors, in either case in the discretion of the board of directors, *on behalf of two or more of the apartment owners,* as their respective interests may appear, with respect to any cause of action relating to the common areas and facilities or more than one apartment. . . .

(Italics ours.) The Board has standing to sue on behalf of and as a surrogate for the individual homeowners. Coldwell Banker argues with merit that this statutory grant of standing does not accord the Board or the Association the status of a separate juristic entity. The Association is not incorporated. It has no life independent of the individual homeowners who are by statute and under the terms of the

Declaration of Condominium required to be members of the Association. The rights being asserted, and the claims being made, belong to the individual homeowners. As found by the trial court, the lawsuit was brought in the names of the nine then members of the Board of Directors of the Association in their representative capacities, not in the name of the Board or Association as a separate entity.

The trial court, however, determined that the claims asserted here accrued at the time the *Board* had notice that the deck and walkway problems were widespread throughout the project. Neither RCW 64.32.240 nor the discovery rule support such a conclusion. RCW 64.32-.240 authorizes the Board to bring suit on behalf of *two* or more apartment owners. There is no requirement that the majority or even that a substantial number of apartments be affected. The trial court's conclusion that, despite the plain meaning of the statute, the Board was required to wait to bring suit until "a sufficient number" of apartment owners were affected is unjustified.

A statute which is plain needs no construction. *King Cy. v. Seattle,* 70 Wn.2d 988, 425 P.2d 887 (1967). It is neither the function nor the prerogative of courts to modify legislative enactments. *Anderson v. Seattle,* 78 Wn.2d 201, 471 P.2d 87 (1970). The trial court's formulation of a requirement of a "sufficient number" of affected units is not supported by the statute and is unworkably vague. The Board's strategic decision to bring suit at the time that it did will not be aided by this court with a reading not sustained by the language or the spirit of RCW 64.32.240.

The trial court's application of the discovery rule is inconsistent with the analysis applied by this court in *White v. Johns–Manville Corp.,* 103 Wn.2d 344, 348, 693 P.2d 687 (1985): "[A] cause of action accrues at the time the plaintiff knew or should have known all of the essential elements of the cause of action." Awareness of the essential elements of a cause of action and awareness that one has a cause of action are not necessarily the same, for purposes of a statute of limitation. *Sahlie v. Johns–Manville Sales*

*Corp.,* 99 Wn.2d 550, 554, 663 P.2d 473 (1983). This court made that distinction in *Sahlie* to underscore our position that a cause of action accrues when a plaintiff discovers, or in the exercise of reasonable diligence, should have discovered, the *elements* of the cause of action, and not when the plaintiff realized that they had a legally cognizable injury.

The applicable statute of limitations in this lawsuit is 3 years from the date of discovery under RCW 4.16.080(2). That statute should operate, however, as of the time the homeowners actually knew or reasonably should have known of the defects that comprised the elements of their causes of action. The trial court acknowledged that many of the individual homeowners knew and complained of defects as early as 1976. The trial court found that between 1976 and 1980 the owners of 13 units were aware of damage that required repair. The Board was sufficiently concerned by June 1979 to consult a lawyer as to who had the responsibility to repair the deteriorating decks. In the face of this abundant evidence of actual notice to the Board and to the individual apartment owners, the trial court's conclusion that the cause of action did not accrue until December 1980 is unsupported by the record.

### IMPLIED WARRANTY OF HABITABILITY

The implied warranty of habitability in Washington is a limited one:

> [W]hen a vendor–builder sells a new house to its first intended occupant, he impliedly warrants that the foundations supporting it are firm and secure and that the house is structurally safe for the buyer's intended purpose of living in it.

*House v. Thornton,* 76 Wn.2d 428, 436, 457 P.2d 199 (1969). *House* and progeny have been applied in this state to grant recovery to the first intended occupants for egregious, fundamental defects in homes which, as the name of the warranty indicates, render the houses unfit to be lived in. The plaintiffs in *House* contended with a house with a foundation so faulty that the basement, walls, floors and

foundation slipped and cracked, and the supporting terrain slid away from the foundation.

This court has not been anxious to extend the implied warranty of habitability beyond its present boundaries. *Frickel v. Sunnyside Enters.*, 106 Wn.2d 714, 725 P.2d 422 (1986) (court declined to extend implied warranty of habitability to sale of apartment complex despite serious foundation defects and improper construction, where property was not built for resale and sales contract contained express disclaimers of such warranty).

Other cases in Washington brought under the implied warranty of habitability premise recovery upon proof of defects which profoundly compromise the essential nature of the subject property as a dwelling. *Klos v. Gockel*, 87 Wn.2d 567, 554 P.2d 1349 (1976) (recovery denied where patio and backyard were damaged by a mud slide and the settling of fill, but house itself suffered only minimal damage); *Allen v. Anderson*, 16 Wn. App. 446, 557 P.2d 24 (1976) (alleged foundation faults, cracks and bows in retaining walls, dismissed on other grounds); *Gay v. Cornwall*, 6 Wn. App. 595, 494 P.2d 1371 (1972) (leaks in roof, plumbing defective, sewer pipe dumped raw sewage into crawl space, furnace motor burned out, drain field washed away).

The doctrine of implied warranty of habitability imposes liability upon builder–vendors in favor of original purchasers of residential property for egregious defects in the fundamental structure of a home. The warranty does not provide recovery for defects in exterior, nonstructural elements adjacent to the dwelling unit. The instant case involves defects similar to those in *Klos v. Gockel, supra.* In *Klos,* a landslide caused damage to the plaintiff's patio, but not to the house itself. The trial court ruled that the slide, while not injuring the foundation, rendered the residence unfit for occupancy, "if not in terms of actual danger, then at least in terms of threatening one's peace of mind". *Klos,* at 569. This court overruled that holding, noting that the plaintiffs never moved out of the house and were still

occupying it at time of trial. *Klos* does not support an extension of the doctrine of implied warranty of habitability for mere defects in workmanship. The *Klos* court denied recovery to the plaintiffs, holding that:

> The law of implied warranty is not broad enough to make the builder–vendor of a house absolutely liable for all mishaps occurring within the boundaries of the improved real property.

*Klos,* at 571–72.

In the case at bar, some of the damaged areas were decks, similar in use to the patio area in *Klos.* Others were walkways that may have comprised the sole means of access to the apartments, although the record fails to make this clear. Finding of fact 15; Clerk's Papers, at 15. As to the access walkways, one could plausibly argue that the defects occurred in an essential portion of the dwelling itself. Unfortunately, the record does not distinguish among the units, and there was no allegation that *any* apartment owner was prevented from using his or her unit because of the defects. Plaintiff homeowners who were not barred by the statute of limitations could plausibly maintain an action for breach of the implied warranty of habitability, where they were unable to enter their dwelling units safely. Such a defect could be said to render a home unit unfit for its intended purpose. Unfortunately, the record before this court is insufficient for purposes of making such a determination.

## NEGLIGENT CONSTRUCTION

Currently, the State of Washington does not recognize a cause of action for negligent construction on behalf of individual homeowners. Beyond the terms expressed in the contract of sale, the only recognized duty owing from a builder–vendor of a newly completed residence to its first purchaser is that embodied in the implied warranty of habitability, which arises from the sale transaction. *House v. Thornton, supra* at 436. Plaintiff homeowners faced with losses that are not of their own making present a sympa-

thetic case, and we understand the desire of the trial court to fashion a remedy. We must exercise caution, however, that we do not unduly upset the law upon which expectations are built and business is conducted.

The theory advanced by the trial court is a peculiar combination of tort and contract law, closely related to the tort law of products liability. Comment, *Manufacturer's Liability to Remote Purchasers for "Economic Loss" Damages— Tort or Contract?*, 114 U. Pa. L. Rev. 539 (1966). Dean Prosser characterized the law of products liability as a "hybrid, born of the illicit intercourse of tort and contract, unique in the law." W. Prosser, *Torts* 634 (4th ed. 1971).

Initially, plaintiffs who suffered personal injuries from defective products could only reach the manufacturer under warranty theories. Courts, however, had difficulty meshing the inapposite "intricacies of the law of sales," Prosser, *The Assault Upon the Citadel*, 69 Yale L.J. 1099 (1960), such as notice and privity, with the plight presented by injured consumers who did not have a direct contractual relationship with the manufacturer. Accordingly, the doctrine fell prey to logical difficulties inherent in this procrustean approach, which addressed problems of unsafe conduct with a legal theory premised on receiving the benefit of a bargain. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1168–69 (3d Cir. 1981).

The first cases holding manufacturers liable for injuries caused by their products in the absence of privity of contract used a negligence theory. The landmark decision in this area was *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916) (Cardozo, J.). *MacPherson* has been accepted in every jurisdiction in the United States to provide a remedy to plaintiffs injured by manufactured items that are dangerous if negligently made. W. Prosser, *Torts* § 96, at 642–43 (4th ed. 1971). Courts reasoned that privity of contract should not stand as a bar to plaintiff consumers who suffered physical injury from a product negligently made.

As a matter of public policy, it is entirely reasonable to

expect manufacturers of goods for sale to the general public to assume responsibility for the safety of their product. In *Seely v. White Motor Co.*, 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17 (1965), Justice Traynor denied recovery to a plaintiff who had pleaded lost profits as the only damages under a negligence theory. Justice Traynor stated at page 18:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. . . .

This court has acknowledged the extreme confusion in the development of our own case law, and we have, in the past, allowed recovery under a negligence theory for lost *profits* standing alone (upon proof of causation and breach of duty). *Berg v. General Motors Corp.*, 87 Wn.2d 584, 591, 555 P.2d 818 (1976). In *Berg,* this court noted the convoluted history of products liability doctrine, conceded that "[c]ourts are anxious to find some legal theory sufficient to protect the public interest", *Berg,* at 593, and made a policy–based decision to allow damages to a commercial fisherman for the anticipated value of a fish catch that was lost when his boat was laid up for repairs of defendant manufacturer's negligently built motor.

The instant case, however, presents a leap beyond the theory applied in *Berg*. The plaintiffs have alleged no injury beyond the affected areas themselves, and no damages beyond the cost of repair. In its effort to find recovery for the plaintiffs, the trial court formulated a theory of recovery in negligence that overlooks the intricacies and logical inconsistencies inherent in the approach.

■ Commentators and courts faced with this issue have found it necessary to distinguish economic loss from physical harm or property damage. The distinction is usually drawn depending on the nature of the defect and the manner in which the damage occurred. Defects of quality are evidenced by internal deterioration, and designated as economic loss, while loss stemming from defects that cause accidents involving violence or collision with external objects is treated as physical injury. *Pennsylvania Glass Sand,* at 1169–70. *See* Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum. L. Rev. 917, 918 (1966); *see also Jones & Laughlin Steel Corp. v. Johns–Manville Sales Corp.,* 626 F.2d 280 (3d Cir. 1980).

Tort law has traditionally redressed injuries properly classified as physical harm. W. Prosser, *Torts* § 101, at 665 (4th ed. 1971). Tort law is concerned with the obligations imposed by law, rather than by bargain. As a matter of public policy, it is appropriate that a duty be imposed on manufacturers to produce products that will not unreasonably endanger the safety and health of the public, whether the ultimate impact of the danger is suffered by people, other property, or on the product itself. In contrast, contract law protects expectation interests, and provides an appropriate set of rules when an individual bargains for a product of particular quality or for a particular use.

In cases such as the present one where only the defective product is damaged, the court should identify whether the particular injury amounts to economic loss or physical damage. In drawing the distinction, the determinative factor should not be the items for which damages are sought, such as repair costs. Rather, the line between tort and con-

tract must be drawn by analyzing interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose. These factors bear directly on whether the safety–insurance policy of tort law or the expectation–bargain protection policy of warranty law is most applicable to the claim in question. *Pennsylvania Glass Sand,* at 1173.

The nature of the defect here was that the decks and walkways were not of the quality desired by the buyers. The "injury" or damage suffered was that the decks themselves deteriorated, not through accident or violent occurrence, but through exposure to the weather.

The plaintiffs advanced theories of recovery under the Consumer Protection Act, RCW 19.86, under a theory of misrepresentation, and under the express warranties contained in the contract of sale with the builder–vendor. The trial court correctly held that recovery was not available under any of these theories, and plaintiffs have not appealed those rulings. This is unremarkable, in that the express terms of the contract with the builder–vendor delegated the risks among the parties, and formed part of the basis of their bargain.

In its search to provide relief where the contract did not, the trial court stretched the implied warranty of habitability beyond recognition to grant recovery to original purchasers of condominium units. The trial court then accepted the plaintiffs' invitation to recognize a poorly reasoned cause of action to grant recovery to subsequent purchasers. The dangers in creating such unreasoned precedent are manifest.

Imposition of tort liability upon the builder–vendors would require them to become the guarantors of the complete satisfaction of future purchasers. A builder–vendor could contract to limit liability for defects with the original purchaser and then find themselves liable for the same defects to a future purchaser with whom they had absolutely no contact. The trial court's formulation makes no distinction between subsequent purchasers who may have

known nothing of the potential deterioration of the decks, and those buyers who may have been able to see the flaking observable to the naked eye from the exhibits before the court. The latter buyers may well have been able to account for the defects with an adjustment to the purchase price. As to such buyers, any recovery from the court would be a pure windfall.

There is nothing in the trial court's disposition of the case to limit liability for the *same* defects in the same units to future subsequent purchasers. In a commodity such as condominiums, it is not unthinkable that speculators could sell and resell the property rapidly enough to escape the strictures of the statute of limitations. This court will not sanction such result–oriented jurisprudence, particularly in an area of the law so vitally enmeshed in our economy and dependent on settled expectations as is the construction business. We decline to recognize a cause of action in negligent construction.

We reverse and remand to the trial court to determine, consistent with this opinion, (1) which, if any, of the plaintiffs were not barred by the statute of limitations, and (2) which units owned by such plaintiffs had walkways so impaired that the sole means of access to the unit was dangerous to negotiate.

PEARSON, C.J., and BRACHTENBACH, DOLLIVER, ANDERSEN, GOODLOE, and DURHAM, JJ., concur.

CALLOW, J. (concurring in part, dissenting in part)—I concur with the majority's discussion of the statute of limitations and the implied warranty of habitability. I dissent, however, from the majority's refusal to recognize a cause of action in negligent construction in a case such as this, where a builder has sold condominiums with latent dangerous defects. The majority reasons that no claim of negligent construction can lie because the purchasers have suffered only "economic loss". I submit this is unsound and unpersuasive. Purchasers of condominiums who have been the

victims of shoddy and unsafe construction practices, yet who have no remedy under the implied warranty of habitability, should not be denied recovery merely because they have been fortunate to escape serious physical injury.

The record before us shows that Coldwell Banker built and sold several condominiums with latent dangerous defects, and that such defects were the result of negligent construction. The trial court specifically found:

> In constructing the deck and railing systems in the complex, Coldwell Banker was negligent in needlessly splicing the rail cap, in failing to provide adequate drainage at the bottom of the enclosed rails and decks, in inadequately flashing the juncture of the deck and the rail wall, in using interior gypsum wallboard inside of the rail structures, rather than exterior gypsum sheathing, especially when accompanied by a failure to protect that interior wallboard by placing adequate building paper over the wallboard and/or over the top of the inside rail structure to prevent rain or other water coming into the structure through the rail cap.
>
> All of the defects, individually or in combination, greatly hastened the rotting of these structures.

Thus, the court concluded:

> Although structurally safe for the buyer's intended purpose at the time of construction and initial purchase by individual owners, a number of the [condominiums'] private decks, balconies and [access] walkways became unsafe through the action of dry rot trapped as a result of construction defects.

The trial court also noted:

> Some of the defects which ultimately led to rotting . . . were not visible, such as lack of ventilation, inadequate flashing or failure to wrap gypsum board with building paper.

As the majority points out, some of the affected purchasers may seek recovery for breach of the implied warranty of habitability. This provides but limited relief. The implied warranty of habitability protects only the first intended occupants of new condominiums, and covers only structural defects which render the condominium uninhabitable.

*Frickel v. Sunnyside Enters.,* 106 Wn.2d 714, 715–18, 725 P.2d 422 (1986); *Klos v. Gockel,* 87 Wn.2d 567, 571–72, 554 P.2d 1349 (1976); *House v. Thornton,* 76 Wn.2d 428, 436, 457 P.2d 199 (1969). It does *not* provide a remedy for subsequent purchaser/occupants; nor for original purchaser/occupants of condominiums with dangerously defective decks or balconies (as opposed to access walkways), since these structures do not render the dwelling itself "uninhabitable." I find no reason to cut off a subsequent purchaser from a remedy in such a situation just because the property has changed hands twice rather than only once.

The purchaser of a condominium has the right to expect that it will be properly constructed and free of latent and dangerous defects of any kind. As explained in *Oates v. JAG, Inc.,* 314 N.C. 276, 333 S.E.2d 222 (1985):

> We must be realistic. The ordinary purchaser of a home is not qualified to determine when or where a defect exists. Yet, the purchaser makes the biggest and most important investment in his or her life and, more times than not, on a limited budget. The purchaser can ill afford to suddenly find a latent defect in his or her home . . . and have no remedy for recourse. This happens too often. The careless work of contractors, who in the past have been insulated from liability, must cease or they must accept financial responsibility for their negligence. In our judgment, building contractors should be held to the general standard of reasonable care for the protection of anyone who may foreseeably be endangered by their negligence.

*Oates,* at 280–81 (quoting *Simmons v. Owens,* 363 So. 2d 142, 143 (Fla. Dist. Ct. App. 1978).

I would join the growing number of jurisdictions that recognize a cause of action for negligent construction. *See, e.g., Oates; Council of Co–Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.,* 308 Md. 18, 517 A.2d 336 (1986); *Cosmopolitan Homes, Inc. v. Weller,* 663 P.2d 1041 (Colo. 1983); *Kristek v. Catron,* 7 Kan. App. 2d 495, 644 P.2d 480 (1982); *Velotta v. Leo Petronzio Landscaping, Inc.,* 69 Ohio St. 2d 376, 433 N.E.2d 147 (1982);

*Juliano v. Gaston,* 187 N.J. Super. 491, 455 A.2d 523 (1982); *Drexel Properties, Inc. v. Bay Colony Club Condominium, Inc.,* 406 So. 2d 515 (Fla. Dist. Ct. App. 1981); *Terlinde v. Neely,* 275 S.C. 395, 271 S.E.2d 768, 10 A.L.R.4th 379 (1980); *Moxley v. Laramie Builders, Inc.,* 600 P.2d 733 (Wyo. 1979); *Brown v. Fowler,* 279 N.W.2d 907 (S.D. 1979); *Sabella v. Wisler,* 59 Cal. 2d 21, 377 P.2d 889, 27 Cal. Rptr. 689 (1963); *Fisher v. Simon,* 15 Wis. 2d 207, 112 N.W.2d 705 (1961). I would hold that a purchaser may bring a claim for negligent construction against the builder–vendor of a home if the home has a latent and dangerous defect which creates a risk of personal injury. Hopefully, of course, the dangerous condition will be detected before personal injury actually occurs. In such a case, the purchaser's recovery would consist of the reasonable cost of correcting the dangerous condition.

The majority rejects this alternative, reasoning that absent physical injury or property damage, the purchaser has suffered only "economic loss" and thus is barred from recovery in tort. This view of negligence law has been rejected by numerous other courts. Most recently, the Maryland Supreme Court approved precisely the cause of action in negligent construction outlined above. The court added that where a latent and dangerously defective condition exists, economic loss alone is not a bar to recovery. The court said:

> The contention that a distinction should be drawn between mere "economic loss" and personal injury is without merit. . . .
> If there is a defect in a stairway and the purchaser repairs the defect and suffers an economic loss, should he fail to recover because he did not wait until he or some member of his family fell down the stairs and broke his neck? Does the law penalize those who are alert and prevent injury? Should it not put those who prevent personal injury on the same level as those who fail to anticipate it?

*Council of Co–Owners Atlantis Condominium,* at 34–35, quoting *Barnes v. Mac Brown & Co.,* 264 Ind. 227, 230, 342

N.E.2d 619 (1976). The additional cases cited likewise reject any distinction between personal injury and economic loss in the context of a negligent construction claim.

Recognizing a cause of action in negligent construction affords purchasers of homes or condominiums a remedy for dangerous and shoddy construction without imposing an undue burden on builder–vendors. Since this cause of action sounds in tort, the remedy extends to both original and subsequent purchasers (*i.e.*, privity of contract with the builder–vendor is not required). However, the builder–vendor's potential liability is not unlimited, for the statute of limitations expressly bars commencement of any suit that does not accrue within 6 years of substantial completion of construction. *See* RCW 4.16.310. Moreover, a purchaser who brings a claim for negligent construction, but who suffers economic loss alone, must prove (1) negligence on the part of the builder–vendor caused a defective condition, (2) the defective condition is dangerous, (3) the defective condition was latent at the time of purchase. As explained in *Cosmopolitan Homes*, at 1045–46:

> The reason for allowing recovery only for latent or hidden defects, which have been defined as "those manifesting themselves after purchase and which are not discoverable through reasonable inspection," . . . is to prevent an action where mere deterioration or loss of a bargain is claimed. . . . Often a buyer is willing to accept certain deficiencies in a house in exchange for a lower purchase price. However, a buyer cannot be expected to discover structural defects which remain latent at the time of purchase.

If a purchaser meets these requirements, there is no reason why he should not recover from the builder–vendor for negligent construction. The alternative offered by the majority is to subject the purchaser to the outworn and antiquated doctrine of caveat emptor. This court should find such an alternative unacceptable.

I would remand to the trial court to determine first, which plaintiffs are barred from recovery by the statute of limitations; second, which plaintiffs have stated a valid

claim for breach of the implied warranty of habitability; and third, which plaintiffs have stated a valid claim for negligent construction as outlined above. I respectfully dissent to the extent that my proposed resolution of this case differs from that of the majority.

DORE, J., concurs with CALLOW, J.