[No. 29836-1-III.    Division Three.    October 25, 2011.]

RAY STEINBOCK ET AL., *Appellants*, v. FERRY COUNTY PUBLIC UTILITY DISTRICT NO. 1 ET AL., *Respondents*.

480

*James A. von Sauer* (of *Law Office of James von Sauer*), for appellants.

*Stephen T. Graham*, for respondents.

¶1 SIDDOWAY, J. — Barbara and Ray Steinbock appeal the dismissal of this, their second action against Ferry County Public Utility District No. 1 (PUD) arising out of the PUD's termination of electric service to their commercial and residential properties. The trial court properly concluded that the tort claims the Steinbocks asserted and proposed to assert in this second action necessarily fail, given the contractual nature of their relationship with the PUD and the determination in the first action that the PUD fulfilled its contractual obligations. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2 In 2005, Barbara and Ray Steinbock purchased the Hitch-n-Post Restaurant and Lounge, located in Republic. As security for the purchase, they pledged all of their real property owned in Ferry County, including Park Place Mobile Home Estates, owned individually by Ms. Steinbock. The application for service that they signed with the PUD provided (as had Ms. Steinbock's prior applications for service to other properties) that they authorized the PUD to furnish electric energy

subject to all provisions of PUD Rules, Regulations & Rate Schedules now existing or hereafter adopted, copies of which are available at the District office, and agree to pay all charges as provided for therein and that the obligations of the parties are covered thereby.

Clerk's Papers (CP) at 96 (service application for Barbara Steinbock dba Hitch-n-Post Restaurant and Lounge), CP at 97 (application for Barbara Steinbock dba Park Place Mobile Home Estates), CP at 98 (application for Barbara Steinbock). By November the Steinbocks were delinquent in their payment to the PUD. By May 2006, the amount owing was over $9,000.00. The PUD notified the Steinbocks at that point that they must pay at least $1,822.61 to continue service. When they failed to do so, the service was disconnected.

¶3 The Steinbocks reached agreement with the PUD for scheduled payment of the arrears and the PUD restored service. When the Steinbocks failed to make the payments as agreed, however, service was terminated again. Eventually the Steinbocks lost the Hitch-n-Post and their other properties in foreclosure. In August 2006 they filed their first action against the PUD, asserting claims for negligence, breach of contract, and tortious interference, and seeking damages for the failure of the restaurant and lounge.

¶4 The PUD obtained dismissal of the tort claims in the first action because the Steinbocks failed to comply with RCW 4.96.020(4), which requires that tort claims be presented to a governmental entity at least 60 days before filing suit. Those claims were dismissed without prejudice. It successfully moved for summary judgment dismissing the Steinbocks' breach of contract claim on the merits. The Steinbocks appealed both dismissals, which were affirmed by this court.

¶5 The Steinbocks filed this second action on May 4, 2009. In addition to naming the PUD, it named as defendants the district's manager, its elected commissioners, and John Does 1-100. The complaint renewed the Steinbocks'

claim of negligence and added claims for negligent supervision, outrage, harassment, and wrongful debt collection practices. The tort claims were generally alleged to arise out of the conduct of the district's manager, who the Steinbocks contend dictated collection positions and service termination that did not comply with PUD service policies. The remainder of the Steinbocks' claims were based on the alleged failure of the PUD to work out a reasonable deferred repayment schedule for their account arrears.

¶6 Shortly after the second action was filed the PUD[1] moved for summary judgment dismissing the Steinbocks' claims. Before the motion was heard, the Steinbocks moved to amend their complaint to add a claim for violation of their civil rights and for declaratory relief. The trial court denied the motion to amend, concluding that the additional causes of action would be "futile and meritless." CP at 193. It thereafter granted the PUD's motion for summary judgment dismissing the five claims asserted by the first amended complaint. The Steinbocks timely appealed.

## ANALYSIS

### I

¶7 We first address the Steinbocks' contention that the trial court wrongly granted summary judgment dismissing their claims for negligence, negligent supervision, outrage, harassment, and wrongful debt collection practices.

¶8 Our review of an order granting summary judgment is de novo. *Swinehart v. City of Spokane*, 145 Wn. App. 836, 843, 187 P.3d 345 (2008). Summary judgment is proper where the record before the court shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The moving

---

[1] The PUD, district manager, and commissioners are jointly represented. In discussing their collective positions and actions in this litigation, we refer to them here and hereafter as "the PUD."

party bears the burden of showing the absence of a material issue of fact. An appellate court may affirm on any basis supported by the record. *Swinehart*, 145 Wn. App. at 844.

¶9 Most of the legal argument in the Steinbocks' brief on appeal is devoted to their arguments that (1) the trial court based its decision on collateral estoppel, which they argue was error inasmuch as the tort-based claims asserted in their first action were dismissed without prejudice and (2) the court improperly required an election of remedies. Election of remedies was not a basis for the trial court's decision. Collateral estoppel played a much more limited role in the dismissals than the Steinbocks appear to understand.

¶10 Central to the Steinbocks' misreading of the trial court's decisions is their position that while a promise made by the PUD solely to them gives rise to a contractual duty, a promise made by the PUD to all of its members, through service policies, gives rise to a duty actionable in tort. The claims asserted in this second action rely substantially on the PUD's undertakings in section 15 of its service policies. The Steinbocks rely, for instance, on the section's statement that "[i]t is a general policy of the District that the District's Credit Manager shall make every effort to arrange a reasonable and feasible deferred payment program for the customer with a bona fide temporary financial difficulty," taking into account factors identified in the policies, and that the district's policy was prepared "to clearly define the steps to be taken by the District prior to termination of electric service . . . and to help ensure that customers are provided every opportunity to avoid termination of service." CP at 78. They also rely on subsections of section 15 identifying cause for termination of service, for notice of proposed termination of service, and for rights in the event of service termination.

¶11 But these are contractual undertakings. The contract between the Steinbocks and the PUD was created

by the several applications that the Steinbocks jointly and individually signed in order to obtain electrical service. Each provides that the furnishing of electric energy is "subject to all provisions of PUD Rules, Regulations & Rate Schedules now existing or hereafter adopted" and that "the obligations of the parties are covered thereby." CP at 96-98. The PUD's service policies relied upon by the Steinbocks (entitled "Customer Service Policies for the Electric Distribution System of Your Public Utility District No. 1 of Ferry County," which PUD testified were the pertinent rules and regulations), available from the district, also state in relevant part:

These Service Policies are a part of all oral or written contracts for delivery of electric energy by the District to its customers. In the absence of any application for service or signed service order, the furnishing of electric service by the District and the use of such service by the customer shall constitute a contract and the customer agrees to pay for such electric service under the rates, terms and provisions of the District's applicable rate. These Service Policies are equally binding on the District and its customers. Copies of these Service Policies are available for inspection at all times at the District office.

CP at 75 (section 2 of the service policies, entitled "Scope").[2] By the terms of the Steinbocks' application and the terms of the service policies themselves, the service policies were core provisions of the Steinbocks' contract with the PUD.

¶12 At the time the Steinbocks pleaded their claims in this second action and the trial court considered the motions to amend and for summary judgment, controlling cases "attempt[ing] to describe the dividing line between the law of torts and the law of contracts" applied a doctrine known as

---

[2] The Steinbocks argue that because of the disparity between the title of the service policies and their description in the service application, they did not realize until receiving the PUD's motion for summary judgment in their first lawsuit that the service policies *were* the PUD's rules, regulation and rate schedule, or a material part thereof. CP at 127, 133-34. The fact that the Steinbocks had not determined the contents of their contract with the PUD before asserting a breach of contract claim makes no difference to this appeal.

the "economic loss rule." *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 385, 241 P.3d 1256 (2010). In *Alejandre v. Bull*, 159 Wn.2d 674, 682, 153 P.3d 864 (2007), the court described the line determined by the "economic loss rule" in the following terms:

> "Tort law has traditionally redressed injuries properly classified as physical harm." It "is concerned with the obligations imposed by law, rather than by bargain," and carries out a "safety-insurance policy" that requires that products and property that are sold do not "unreasonably endanger the safety and health of the public." Contract law, in contrast, carries out an "expectation-bargain protection policy" that "protects expectation interests, and provides an appropriate set of rules when an individual bargains for a product of particular quality or for a particular use." In general, whereas tort law protects society's interests in freedom from harm, with the goal of restoring the plaintiff to the position he or she was in prior to the defendant's harmful conduct, contract law is concerned with society's interest in performance of promises, with the goal of placing the plaintiff where he or she would be if the defendant had performed as promised.

(Citations omitted) (quoting *Stuart v. Coldwell Banker Commercial Grp., Inc.*, 109 Wn.2d 406, 420-21, 745 P.2d 1284 (1987)).

■■ ¶13 In November 2010, after trial court proceedings in this action were completed, as was some of the briefing of this appeal, the Washington Supreme Court surveyed its prior cases and reformulated its approach in two companion cases: *Eastwood*, 170 Wn.2d 380, and *Affiliated FM Insurance Co. v. LTK Consulting Services, Inc.*, 170 Wn.2d 442, 243 P.3d 521 (2010). Because the term "economic loss rule" inadequately captured the principles involved, the court adopted the more apt term "independent duty doctrine" to describe when a party to a contractual relationship may be able to assert tort claims. *Eastwood*, 170 Wn.2d at 402. As applied to the facts of this case, the fundamental principles remain unchanged from those applied by the trial court.

¶14 In *Eastwood*, the court observed that in all such cases, the issue is whether the injury suffered by the party claiming breach of a duty or duties is only an economic loss remediable under the law of contracts or whether it is also a tort. *Id.* at 387. Stated another way, it is whether a breach of contract can simultaneously be a breach of a tort duty that arises independently of the contract's terms. *Id.* The court answered that it can be, but only when an independent tort duty overlaps with a contractual obligation. *Id.* Ordinary tort principles have always resolved this question: "An injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract. The court determines whether there is an independent tort duty of care, and '[t]he existence of a duty is a question of law and depends on mixed considerations of logic, common sense, justice, policy, and precedent.' " *Id.* at 389 (alteration in original) (internal quotation marks omitted) (quoting *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 243, 35 P.3d 1158 (2001)). "When no independent tort duty exists, tort does not provide a remedy." *Id.*

¶15 Where the issue arises, the role of the trial court is to determine if the duty sought to be enforced is one essentially assumed by agreement or imposed by law. If it is a duty solely assumed by agreement, contract remedies apply. If it is a duty based upon a standard of care imposed by established law, unless clearly waived or modified by the parties' agreement, tort remedies apply. *Id.* at 407 (Chambers, J., concurring).

¶16 The only legal authority that the Steinbocks cited below and on appeal for the existence in their case of tort as well as contract duties is *Smith v. Bates Technical College*, 139 Wn.2d 793, 991 P.2d 1135 (2000). But *Bates* merely observed, in an unrelated context, that Washington recognizes the tort of discharge from employment in violation of public policy because the right protected is independent of any contractual agreement between the plaintiff and defendant. *Id.* at 803. Notably, it was our Washington State Supreme

Court that recognized the tort of discharge in violation of public policy. *Id.* at 801 (noting that our Supreme Court recognized the cause of action in *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984)). Lower courts must be cautious in applying the independent duty doctrine to create extra-contractual tort remedies for contracting parties, especially outside the areas where the Supreme Court has spoken. *See Eastwood*, 170 Wn.2d at 407 (Chambers, J., concurring).

¶17 The primary basis for the trial court's conclusion that the Steinbocks had no viable noncontractual claims was that the relationship between the Steinbocks and the PUD was fundamentally contractual and the Steinbocks failed to articulate and support independently existing duties breached by the PUD. The trial court's decisions were based on the preclusive effect of dismissal of the first action to only a limited extent; it did not conclude that claim preclusion barred any of the Steinbocks' claims, and relied on issue preclusion only for the binding determination that the PUD breached no contract duty. Its decisions were not based on election of remedies because it never held that the Steinbocks had to choose between tort and contract claims; rather, it held that absent an independent duty and for other reasons, their tort claims failed.

¶18 Having addressed that threshold misunderstanding of the trial court's rulings, we turn to the Steinbocks' challenge to dismissal of their specific claims.

¶19 *Negligence.* The Steinbocks' claim for negligence alleged that the PUD engaged in unreasonable collection and termination actions in breach of a duty created by its service procedures. The defendants' answer admitted the PUD's duty to follow procedures but denied that the duty had been breached.[3] To prove a claim for negligence, the

---

[3] In support of its motion for summary judgment, the PUD submitted a copy of its service procedures and sworn declarations and business records establishing that before the second termination of service, PUD employees attempted to contact the Steinbocks by phone at the Hitch-n-Post and left messages, but did not

Steinbocks must establish (1) the existence of a duty, (2) a breach of that duty, (3) a resulting injury, and (4) that the breach was the proximate cause of the injury. *Reynolds v. Hicks*, 134 Wn.2d 491, 495, 951 P.2d 761 (1998). The trial court dismissed the negligence claim on grounds that any failure by the PUD to follow its service policies gives rise to a breach of contract claim, not a negligence claim.

¶20  For the reasons most recently explained in *Eastwood* and *LTK Consulting*, the trial court was correct. Because the Steinbocks rely on the service policies (core provisions of their contract with the PUD) and identify no independent duty, they have no negligence claim.

¶21 *Negligent Supervision.* The Steinbocks' negligent supervision claim asserts that the defendant commissioners negligently "failed to perform their elected duty to insure that the PUD officers and managers carried out the announced PUD's policies when performing their duties." CP at 46-47. The gravamen of their allegations is that the commissioners left the district's manager "in complete and unbridled control of PUD business" and that in the absence of control, she failed to conform to service procedures. *Id.* at 47.

¶22  To establish a claim of negligent supervision of an employee, a plaintiff must prove that (1) the employee presented a risk of harm to others; (2) the employer knew, or in the exercise of reasonable care, should have known, that the employee presented such a risk; and (3) the employer's failure to adequately supervise the employee was the proximate cause of plaintiff's injury. *Niece v. Elmview Grp. Home*, 79 Wn. App. 660, 667, 904 P.2d 784 (1995), *aff'd*, 131 Wn.2d 39, 929 P.2d 420 (1997). Negligent supervision is simply one type of negligence—a negligent act or omission that presents an unreasonable risk of harm to another

hear back. Collectively, the procedures and the declarations arguably establish that there is no genuine issue of material fact that most, if not all, of the PUD's procedures were followed in terminating the Steinbocks' service. We do not decide this issue because as a matter of law, compliance with the service procedures presented a contractual issue resolved in the PUD's favor in the first action.

through the foreseeable action of a third party. *See* RESTATE-MENT (SECOND) OF TORTS §§ 302, 302A (1965).

¶23  As pointed out by the PUD, Title 54 RCW governs the operation of public utility districts and dictates the relative roles of a district's commission and its district manager. While the powers of the district are exercised through the members of the commission, *see* RCW 54.12.010, commissioners are required to appoint and may remove an experienced executive as district manager, who "shall be the chief administrative officer of the district, in control of all administrative functions and shall be responsible to the commission for the efficient administration of the affairs of the district placed in his or her charge." RCW 54.16.100. There is nothing in Title 54 RCW, nor have the Steinbocks pointed to any other authority that supports their allegation that the commission is an "insurer" that the district manager will carry out PUD policies. That alone is a sufficient basis for dismissing the claim. Second, the Steinbocks are bound by the determination implicit in dismissal of the first action that service policies, being terms of the service contract, were not breached. Third, the Steinbocks did not allege in their complaint nor present any evidence that the commissioners knew or should have known that their district manager presented a risk of harm to others. For multiple reasons, then, the trial court properly dismissed the negligent supervision claim.

¶24  *Outrage.* The Steinbocks rely for their claim of the tort of outrage on the PUD's alleged failure to make accommodations for their nonpayment and termination of their power without notice. To establish outrage, a plaintiff must prove (1) outrageous and extreme conduct by the defendant, (2) the defendant's intentional or reckless disregard of the probability of causing emotional distress, and (3) actual result to the plaintiff of severe emotional distress. *Commodore v. Univ. Mech. Contractors, Inc.*, 120 Wn.2d 120, 135, 839 P.2d 314 (1992).

¶25  Any claim of outrage must be based on conduct " 'so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975) (emphasis omitted) (quoting RESTATEMENT § 46 cmt. d). The PUD argues on appeal that the trial court has a gatekeeping role in cases alleging intentional infliction of emotional distress, citing *Restatement* § 46 comment h, which characterizes the common law of torts as providing that "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *See* Br. of Resp'ts at 17-24; *accord Phillips v. Hardwick*, 29 Wn. App. 382, 387, 628 P.2d 506 (1981). The PUD also argues that where the conduct complained of was within a defendant's legal rights it is privileged, whether or not extreme, citing *Restatement* § 46, comment g. Br. of Resp'ts at 17-24.

¶26 Dismissal of the outrage claim was warranted on both grounds urged by the PUD. In light of dismissal of the contract claim, the acts and omissions of the PUD alleged by the Steinbocks were not in violation of its service contract and were privileged. Even viewing the parties' summary judgment submissions in the light most favorable to the Steinbocks, the PUD's acts or omissions may not reasonably be regarded as so extreme and outrageous as to permit recovery.

¶27 *Harassment.* The Steinbocks' operative allegation in support of their claim of harassment is

[t]hat . . . Defendants . . . intended by their actions to violate Plaintiff's right to be left alone, her rights of privacy, and created such a hostile and unpleasant living environment with the intent to cause the Steinbocks to pack up and leave the Republic area and to move elsewhere where warmth during the winter could be reasonably obtained.

CP at 50. The trial court dismissed the claim on the basis that there is no tort of harassment in the state of Washing-

ton. The Steinbocks' brief on appeal cites no authority for the existence of this claim for relief. Dismissal was proper.

¶28 *Wrongful Debt Collection Practices.* The Steinbocks' "wrongful debt collection practices" claim alleged that all defendants "intended by their actions to use unfair and unconscionable means to collect the separate property debt owed by [Ms. Steinbock] on the Park Place trailer court accounts by squeezing the marital business, the [Hitch-n-Post], owned jointly by [the Steinbocks] to force the marital business and properties to pay on the separate property debt." CP at 50. The trial court concluded that if Washington recognizes an action for wrongful debt collection against an entity collecting its own debt, the Steinbocks demonstrated no facts supporting it.

¶29 On appeal, the Steinbocks concede that they did not base their cause of action on state or federal debt collection statutes "because these statutes by their terms or by case law did not expressly apply to the Steinbock's [sic] factual situation. However, the statutes do reflect public policy." Br. of Appellants at 46. From this, they argue that they can sue for conduct *not* made actionable by Congress or the legislature but which offends the public policy implied, in their view, by the conduct that *is* made actionable. The flaw with their position is obvious. Where the legislature creates remedies not available at common law it not only decides policy, it defines the extent and limits of remedies appropriate to address the legislatively-determined policy. The Steinbocks have no debt collection practice claim.

## II

¶30 We next turn to the Steinbocks' challenge to the trial court's denial of their motion to amend. We review the denial of a motion to amend for manifest abuse of discretion. *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 165, 736 P.2d 249 (1987). A trial court abuses its discretion when it bases the decision on untenable grounds or reasons.

*Nepstad v. Beasley*, 77 Wn. App. 459, 468, 892 P.2d 110 (1995). A motion to amend is properly denied where the trial court reasonably determines that proposed amendments are meritless, futile, or unduly prejudicial. *Haselwood v. Bremerton Ice Arena, Inc.*, 137 Wn. App. 872, 889-90, 155 P.3d 952 (2007), *aff'd*, 166 Wn.2d 489, 210 P.3d 308 (2009).

¶31 *Civil Rights Claims.* 42 U.S.C. § 1983 " 'is not itself a source of substantive rights,' " but rather provides " 'a method for vindicating federal rights elsewhere conferred.' " *Graham v. Connor*, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)). To maintain a § 1983 claim, a plaintiff must prove (1) that some person deprived him or her of a federal constitutional or statutory right and (2) that the person was acting under color of state law. *Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 11, 829 P.2d 765, *cert. denied*, 506 U.S. 1028 (1992). The Steinbocks' proposed § 1983 claim was based on the PUD's alleged failure to provide pretermination notice and a pretermination hearing, which the Steinbocks contend violated their rights to procedural and substantive due process under the Fifth and Fourteenth Amendments to the United States Constitution.[4] They do not identify the property or liberty interest they contend was deprived without due process.

¶32 While the Steinbocks have not identified the protectable interest on which they rely, the United States Supreme Court has recognized that state law may give a utility customer a protected property interest in continued service conditioned upon payment of the charges properly due. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11, 98 S. Ct. 1554, 56 L. Ed. 2d 30 (1978). Under the common law, a company supplying electricity to the public has a

---

[4] They also alleged that the conduct violated state law and the state constitution, but 42 U.S.C. § 1983 provides no remedy for violation of rights under state law.

right to cut off service to a customer for nonpayment of a just service bill and the company may adopt a rule to that effect. 436 U.S. at 9-10 & n.9. An exception to the general rule exists when the customer has a bona fide dispute concerning the correctness of the bill. *Id. Craft* holds that due process requires that before termination a utility customer receive notice reasonably calculated to apprise him or her of a process for presenting any complaint that the customer has been overcharged or charged for services not rendered. *Id.* at 16. In *City of West Covina v. Perkins*, 525 U.S. 234, 242, 119 S. Ct. 678, 142 L. Ed. 2d 636 (1999), the Court made clear that the notice need not be individualized and is satisfied where a utility makes publicly available the administrative procedures to be followed by a customer who contests a bill. Among other authority, *Perkins* quotes *Atkins v. Parker*, 472 U.S. 115, 131, 105 S. Ct. 2520, 86 L. Ed. 2d 81 (1985) for its holding that " '[t]he entire structure of our democratic government rests on the premise that the individual citizen is capable of informing himself about the particular policies that affect his destiny.' " 525 U.S. at 241 (alteration in original).

¶33 Here, had leave to amend been granted, the final judgment dismissing the Steinbocks' contract claim would preclude them from maintaining that the PUD did not comply with its procedures for notice and termination. Equally important, the Steinbocks have never denied that the PUD's policies were publicly available, nor have they contended that their payments were current at the time their service was terminated. Given these multiple obstacles to establishing a civil rights claim, the trial court properly concluded that amendment to assert such a claim was futile.

¶34 *Declaratory Judgment.* The Steinbocks' proposed claim for declaratory relief sought determinations of seven alleged "actual controvers[ies]" between them and the PUD. CP at 160. Each depended on construing the Steinbocks' rights under particular provisions of the PUD's service

procedures or on matters governed by the service procedures. In light of the final judgment dismissing the Steinbocks' breach of contract claim, there is nothing further to determine with respect to their rights in matters addressed by the service procedures. Here again, amendment would have been futile and was properly denied.

¶35 We affirm.

KULIK, C.J., and BROWN, J., concur.