[No. 26443-2-III.   Division Three.   July 15, 2008.]

WILLIAM R. SWINEHART ET AL., *Appellants*, v. THE CITY OF SPOKANE, *Respondent*.

*Michael V. Felice*, for appellants.

*Howard F. Delaney, City Attorney*, and *Ellen M. O'Hara, Assistant*, for respondent.

¶1 Kulik, A.C.J. — Under the recreational use statute, RCW 4.24.200 and .210, landowners who allow the public to use their land for recreational purposes are generally immune from liability. An exception to the general immunity is for injury-causing conditions that are latent. William Swinehart and Heidi Swinehart brought this action seeking damages for back injuries he sustained after sliding down the "Red Wagon" slide at Riverfront Park in Spokane, Washington.

¶2 Mr. Swinehart argues that the improperly maintained playground fill constituted a latent condition. We disagree because the condition of the fill was obvious and readily apparent to slide users and, therefore, not latent. We affirm the trial court's grant of summary judgment to the city of Spokane (City).

## FACTS

¶3 On June 10, 2005, Mr. Swinehart and his wife, Heidi, were visiting Riverfront Park while on vacation in Spokane. Riverfront Park is owned by the City and the playgrounds are open to the public free of charge. Located inside Riverfront Park is a giant replica of a Radio Flyer Wagon, locally known as the Red Wagon. The Red Wagon was designed and built by local artist, Ken Spiering, and was installed at Riverfront Park in 1990 as part of the state Centennial celebration. Since its construction, the Red Wagon has become a popular park attraction for both children and adults.

¶4 The Red Wagon is considered an interactive sculpture/playground piece and is made primarily of metal with concrete wheels. Specifically, the Red Wagon is 12 feet high, 27 feet long, and 12 feet wide. The attached slide, which is designed to look like the handle of the giant wagon, has a critical height of 8 feet 8 inches. The slide is 19 feet long and angled at 30 degrees. Park visitors can climb up the stairway located at the back of the Red Wagon that leads to a platform on the inside of the wagon. Once inside the body of the wagon, visitors can proceed down by way of the slide or go back down the stairway.

¶5 The Red Wagon is surrounded by a cement containment pit, which is 18 inches deep. The containment pit is routinely filled with engineered wood chip material. Wood chips are a product used in the playground industry to reduce the likelihood of injury in the event of a fall. The city of Spokane Parks and Recreation Department (Parks Department) has a standard of filling the wood chips to a depth of 18 inches, which then compresses and settles to 12 inches. In addition, a rubber mat, three and one-half feet by seven feet, is positioned and secured at the bottom of the slide exit. The rubber mat is designed to further soften the landing for any user of the slide and to prevent displacement of the wood chips. The City acknowledged that the playground fill is known to become displaced or compacted at slide exits.

¶6 The affidavit of Thomas Higgins, a parks facility foreperson, established that the Red Wagon is maintained by the Parks Department. During the summer months, city employees monitor the level of wood chips on a daily basis. The City recognizes that during the warmer months when visitor activity is high, the wood chips get displaced. Maintenance staff are instructed to refill the pit as necessary to maintain a level between 12 and 18 inches deep. The staff uses a variety of hand tools (i.e., garden rakes, leaf rakes, pitchforks, shovels, and, at times, leaf blowers) to rearrange the wood chips as they are displaced by park users.

¶7 The City submitted the affidavit of Taylor Bressler, the manager of planning and development for the Parks Department and a licensed landscape architect. Mr. Bressler is responsible for various aspects of the design, maintenance, and safety issues regarding the Red Wagon playground site. Mr. Bressler stated in his affidavit that he is familiar with requirements and recommendations for playground safety, including the American Society for Testing and Materials (ASTM) and Consumer Product Safety Commission (CPSC) standards as they relate to certain manufactured consumer playground equipment. The ASTM and CPSC playground guidelines are voluntary and geared

toward typical users between the ages of 2 and 12 years old. At the time of his injury, Mr. Swinehart was 59 years old.

¶8 Mr. Bressler also stated that the Parks Department strives to meet the national playground safety compliance standards. Mr. Bressler's affidavit reiterated that the City has adopted a standard of filling the wood chips to a depth of 18 inches, which then compresses and settles to 12 inches. Finally, Mr. Bressler acknowledged in his deposition that having the proper amount of wood chips is important to the prevention of fall-related injuries and that a lack of fill material or an overly compressed surface area could increase the likelihood of injury.

¶9 *The Accident.* While in the park, the Swineharts observed the Red Wagon and walked over to get a closer look and to take pictures for their granddaughter. To get a better view, Mr. Swinehart climbed up the ladder of the Red Wagon while Ms. Swinehart took pictures of him. To get down, Mr. Swinehart decided to go down the slide. When he went down the slide, he landed directly on his buttocks on the wood chip surfacing at the bottom of the slide. As a result of the fall, Mr. Swinehart sustained lower spine injuries, including a compression fracture to his vertebrae. Ms. Swinehart stated that neither she, nor her husband, were concerned with or paid any attention to the playground fill at the Red Wagon while they were at the park until after the accident occurred.

¶10 *Procedural History.* The Swineharts filed a negligence action against the City, seeking to recover damages resulting from the accident. On May 16, 2007, the City filed a motion for summary judgment. The City asserted that it was immune from liability for injuries sustained in its parks under the recreational use statute, RCW 4.24.200 and .210. The City had previously asserted the statute as an affirmative defense in its answer to the Swineharts' complaint. The City argued that no exception to recreational use immunity applied in the present case because Mr. Swinehart's injuries did not result from a latent condi-

tion of the Red Wagon and that, therefore, summary judgment was appropriate.

¶11 Subsequently, the Swineharts brought a motion on July 13, 2007, seeking partial summary judgment with respect to the City's liability. Along with the motion, the Swineharts filed a memorandum in response to the City's motion for summary judgment and in support of their motion. The Swineharts argued that the City was not immune but, instead, was liable under the recreational use statute because the insufficient and improperly maintained playground fill at the Red Wagon slide was a known, dangerous, artificial, and latent condition. In support of their motion, the Swineharts submitted photographs allegedly taken the day after Mr. Swinehart's injury. The Swineharts asserted that the photographs reveal a poorly-maintained surfacing area at the slide exit. The City disagreed and argued that the photographs show that the wood chips were almost to the top of the containment pit.

¶12 The Swineharts also submitted the declaration of their playground safety expert, Thom Thompson. The record shows that Mr. Thompson performed an inspection of the Red Wagon playground site on August 18, 2005, nine weeks after the injury. The Swineharts claimed that Mr. Thompson's declaration established that the playground fill was insufficient and improperly maintained under the City's own standards as well as playground industry standards.

¶13 As part of the safety inspection, Mr. Thompson examined the condition of the playground fill immediately at the exit of the slide and in the "use zone." Clerk's Papers (CP) at 73. Mr. Thompson also measured the depth of the wood chips. The inspection revealed that the wood chips were widely dispersed at the slide exit, leaving a large pit or depression to serve as the landing area, rather than a level surface. The depth of the fill material at the slide exit was two and one-half inches, which consisted of one-quarter inch of loose wood chips, one inch of highly compressed sawdust fines, and one and one-quarter inches of highly

compressed coarse wood chips. The depth of the fill gradually increased to 12 inches near the sidewalk. Under national playground safety standards, slides with a critical height of 8 feet 8 inches require, at a minimum, 12 inches of organic fill in a loose and uncompressed state.

¶14 Mr. Thompson also assessed the condition of the wood chips. He determined that the wood chips were severely compacted throughout the site. Mr. Thompson also noted that the bottom layers of the wood chips had turned into compressed mulch and that such material does not have a protective fall rating. In Mr. Thompson's opinion, the surfacing at the Red Wagon had not been properly maintained for at least one year prior to Mr. Swinehart's injury. Mr. Thompson concluded:

> The condition at this playground that lead [sic] directly to the cause of Mr. Swinehart's spinal injury was the insufficient surfacing material at the end of the slide exit. The surfacing was not the appropriate depth and it was in a highly compressed state. It did not provide the cushioning effect necessary to reduce the impact of a fall.

CP at 75.

¶15 On August 22, 2007, the trial court granted the City's motion for summary judgment. In its order, the court held: "There exists no material issue [of] fact as to the latency of the surfacing condition at the slide exit and the City is therefore entitled to the benefit of immunity under the Recreational Use statute." CP at 185. The Swineharts timely appealed from that order.

## ANALYSIS

¶16 Summary judgment rulings are reviewed de novo. *Seybold v. Neu*, 105 Wn. App. 666, 675, 19 P.3d 1068 (2001). When reviewing an order granting summary judgment, this court engages in the same inquiry as the trial court, considering all facts and reasonable inferences in the light most favorable to the nonmoving party. *Kahn v. Salerno*, 90 Wn. App. 110, 117, 951 P.2d 321 (1998).

¶17 Summary judgment is proper if the record before the court shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Ruff v. County of King*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995). An appellate court may affirm on any basis supported by the record and the moving party bears the burden of showing the absence of a material issue of fact. *Redding v. Virginia Mason Med. Ctr.*, 75 Wn. App. 424, 426, 878 P.2d 483 (1994). A material fact is one upon which the outcome of the litigation depends. *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 642, 618 P.2d 96 (1980). Once the moving party has established that there is no dispute as to any issue of material fact, the burden shifts to the nonmoving party to establish the existence of an element material to its case. *Kahn*, 90 Wn. App. at 117. Questions of fact may be determined on summary judgment as a matter of law where reasonable minds could reach but one conclusion. *Alexander v. County of Walla Walla*, 84 Wn. App. 687, 692, 929 P.2d 1182 (1997).

¶18 The trial court granted the City's motion for summary judgment on the basis that the City was entitled to immunity from suit under the recreational use statute. In granting the City's motion, the court concluded that there was no genuine issue of material fact as to the "latency of the surfacing condition at the slide exit." CP at 185.

¶19 On appeal, Mr. Swinehart contends that the condition which caused his injuries was the insufficient and improperly maintained playground fill at the slide exit of the Red Wagon, and that this condition was latent. Accordingly, the single issue before this court is whether the trial court erred in finding there was no genuine issue of fact regarding the latency of the fill condition.

¶20 *Recreational Use Statute.* Under Washington's recreational use statute, RCW 4.24.200 and .210, public or private landowners who allow members of the public to use their land for recreational purposes free of charge are generally immune from liability. RCW 4.24.210; *Curran v. City of Marysville*, 53 Wn. App. 358, 360-61, 766 P.2d 1141

(1989). The purpose of this statutory grant of immunity is to encourage landowners to make their lands available to the public for recreational uses by limiting their liability to those who are injured while on the property. RCW 4.24.200; *Davis v. State*, 102 Wn. App. 177, 184, 6 P.3d 1191 (2000), *aff'd*, 144 Wn.2d 612, 30 P.3d 460 (2001).

¶21 RCW 4.24.210(1) provides in pertinent part:

[A]ny public or private landowners or others in lawful possession and control of any lands . . . who allow members of the public to use them for the purposes of outdoor recreation . . . without charging a fee of any kind therefor, *shall not be liable for unintentional injuries to such users.*

(Emphasis added.) The statute expressly includes publicly owned lands, both urban and rural, and has been interpreted to apply to municipal parks and their playground and exercise areas. *Curran*, 53 Wn. App. at 362.

¶22 *Exception to Immunity.* Recreational use immunity, however, is not absolute. The statute does not limit a landowner's liability when injuries are sustained "by reason of a *known dangerous artificial latent condition* for which warning signs have not been conspicuously posted." RCW 4.24.210(4) (emphasis added). Courts which have interpreted this statutory language have consistently held that the four terms: "known," "dangerous," "artificial," and "latent" modify the term "condition," not one another. *Van Dinter v. City of Kennewick*, 121 Wn.2d 38, 46, 846 P.2d 522 (1993); *Tabak v. State*, 73 Wn. App. 691, 695, 870 P.2d 1014 (1994). Therefore, in order for this exception to apply, each of the four elements—known, dangerous, artificial, and latent—must be present in the injury-causing condition. *Tabak*, 73 Wn. App. at 695.

¶23 *Injury-Causing Condition.* The first step in the court's analysis is to identify the injury-causing condition. *Davis*, 102 Wn. App. at 185. The court in *Davis* stated, "Because we cannot determine whether the injury-causing condition was latent, artificial, and known to the State without first specifying the object or instrumentality at

issue, this is a critical question." *Id.* Under the recreational use statute, the injury-causing condition is defined as "the specific object or instrumentality that caused the injury, viewed in relation to other external circumstances in which the instrumentality is situated or operates." *Ravenscroft v. Wash. Water Power Co.*, 136 Wn.2d 911, 921, 969 P.2d 75 (1998).

¶24 Here, the parties dispute which condition caused Mr. Swinehart's injuries. Mr. Swinehart argues that the condition which caused his injury was the insufficient and improperly maintained playground fill at the slide exit of the Red Wagon. He contends that the level of wood chips at the slide exit at the time of the incident was far below the City's standards and identical public playground industry standards according to the CPSC. In addition, Mr. Swinehart argues that the playground fill was in an excessively compressed and deteriorated state. In contrast, the City contends that the condition in this case was the Red Wagon as it rests on a bed of wood chips.

¶25 For purposes of summary judgment, we must adopt Mr. Swinehart's view of the injury-causing condition. We engage in the same inquiry as the trial court, and we must consider all facts and reasonable inferences therefrom in the light most favorable to the Swineharts as the nonmoving party. *See Kahn*, 90 Wn. App. at 117. Identifying the injury-causing condition is a factual determination. *Van Dinter*, 121 Wn.2d at 44. "Where there is a dispute, the ultimate determination of what the condition was is for the trier of fact." *Tabak*, 73 Wn. App. at 698.

¶26 *Latency of the Playground Fill.* For tort liability to arise, this court must consider whether the injury-causing condition was "latent," as required by RCW 4.24.210. The trial court granted the City's motion for summary judgment on the basis that there was no genuine issue of material fact as to the latency of the playground fill at the Red Wagon slide exit.

¶27 The Swineharts contend that the insufficient and improperly maintained wood chips at the Red Wagon slide

exit was latent not only to Mr. Swinehart, but also to the general class of users, as identified by the City. The Swineharts argue that such users, which include children, parents, and the disabled, are not concerned or even capable of appreciating the integrity of the playground surfacing or the varying levels of wood chips within the containment pit at the Red Wagon.

¶28 The Swineharts further point out that Mr. Bressler testified that park visitors cannot visually determine the actual depth of the wood chips in the containment pit by standing on the playground fill alone because they do not know how deep the pit is. Similarly, Mr. Thompson maintains that park users have no means to determine the actual depth of the playground fill or to evaluate whether the level of the fill in the containment pit was adequate. According to the Swineharts, the dangers associated with insufficient playground fill are latent because the dangers lie beneath a visible surface.

¶29 The City contends that the Swineharts' claim was properly dismissed on summary judgment because there was no "latent" condition of the Red Wagon that caused injury to Mr. Swinehart. The City argues that the condition of the bed of wood chips was readily apparent to any adult or child who cared to look. Accordingly, the City maintains that the condition of the Red Wagon site was patent, or obvious, to park users and not hidden in any way.

¶30 The City also points out that the wood chips were not completely level anywhere around the Red Wagon—it is displaced or mounded in a continuously-changing pattern as visitors use the playground. Despite the fact that Mr. Swinehart had not noticed the alleged lack of wood chips at the bottom of the slide, any displacement of fill would have been obvious. The City notes that if the wood chips were as deficient at the slide exit as Mr. Thompson alleged, then Mr. Swinehart could have seen that fact by examining the area before he chose to either slide or land as he did. According to the City, Mr. Swinehart's failure to pay adequate attention to his surroundings as he approached

the end of the slide does not convert a playground area into a "latent" condition for which the City should be held liable. We agree.

¶31 Under RCW 4.24.210, the term "latent" modifies "condition," not "danger." *Van Dinter*, 121 Wn.2d at 46. "Therefore injuries that result from latent dangers presented by a patent condition are not actionable under RCW 4.24.210." *Id.* Similarly, the court in *Ravenscroft* held that the "condition itself, not the danger it poses, must be latent." *Ravenscroft*, 136 Wn.2d at 924.

¶32 Further, "latent," for purposes of the recreational use statute, is defined as "not readily apparent to the recreational user." *Van Dinter*, 121 Wn.2d at 45. Whether a condition is patent or latent is generally a question of fact. *Tabak*, 73 Wn. App. at 698. However, if the condition is obvious, then it cannot be latent. *Id.* "What a particular user sees or does not see is immaterial." *Widman v. Johnson*, 81 Wn. App. 110, 114-15, 912 P.2d 1095 (1996). Consequently, the "dispositive question is whether the condition is readily apparent to the general class of recreational users, not whether one user might fail to discover it." *Ravenscroft*, 136 Wn.2d at 924.

¶33 In *Gaeta v. Seattle City Light*, 54 Wn. App. 603, 604, 774 P.2d 1255 (1989), the appellant was injured while on a cross-country sightseeing tour when the tire of his motorcycle caught in the tracks of a road running over Diablo Dam. On one side of the roadway were parallel tracks, positioned approximately five feet apart, each with a two and one-half-inch wide groove adjacent to it. *Id.* at 605. As Mr. Gaeta crossed the dam, he failed to notice the set of tracks until he found himself driving in between them. *Id.* When Mr. Gaeta attempted to cross the tracks, a wheel of his motorcycle jammed in the groove, causing him to fall and sustain injuries. *Id.* at 605-06. The trial court concluded that the grooves adjacent to the tracks did not constitute a known, dangerous, artificial, and latent condition and, therefore, Seattle City Light was immune under the recreational use statute. *Id.* at 606. In affirming this

decision, the Court of Appeals held that even though Mr. Gaeta had not noticed the tracks, the condition was not latent because the tracks were obvious. *Id.* at 610-11.

¶34 In *Van Dinter*, the primary issue on appeal was whether the injury-causing condition was latent. *Van Dinter*, 121 Wn.2d at 44. In *Van Dinter*, the appellant, Mr. Van Dinter, was injured when he struck his eye on a metal rod protruding from a caterpillar-shaped piece of playground equipment at a city park. *Id.* at 40. The court concluded that "the condition that caused [Mr.] Van Dinter's injury was the caterpillar's placement, rather than the caterpillar as viewed in isolation." *Id.* at 44.

¶35 Mr. Van Dinter argued that a condition is latent for purposes of the recreational use statute "if its injury-producing aspect is not readily apparent to the ordinary recreational user." *Id.* at 45. Mr. Van Dinter asserted that the city should be liable because, although the condition itself (the caterpillar) was obvious, its injury-causing aspect was not. *Id.* The court, in rejecting Mr. Van Dinter's argument, stated:

> Admittedly, it may not have occurred to [Mr.] Van Dinter that he could injure himself in the way he did, but this does not show the injury-causing condition—the caterpillar's placement—was latent. At most, it shows that the present situation is one in which a patent condition posed a latent, or unobvious, danger. RCW 4.24.210 does not hold landowners potentially liable for patent conditions with latent dangers. The condition itself must be latent.

*Id.* at 46. Ultimately, the court found that the caterpillar and its injury-causing aspect were obvious, not latent, and therefore the city was immune from Mr. Van Dinter's action under the recreational use statute. *Id.* at 47.

¶36 Here, the trial court properly determined that any insufficient or improperly-maintained playground surface at the Red Wagon slide exit was not a latent condition. Instead, the displacement and condition of the wood chips at the playground was patent, or obvious.

¶37 The Swineharts, relying on statements provided by their playground safety expert, Mr. Thompson, and the City's representative, Mr. Bressler, argue that park visitors cannot determine the actual depth of the wood chips in the containment pit by standing on the playground fill alone. Mr. Bressler testified in his deposition as to the latency of the playground fill at the Red Wagon as follows:

Q [MR. FELICE]: Is there any way that by standing on the surfacing alone you can determine the depth of surfacing at the playground?

. . . .

A Well, I would say I know that pit's 18 inches deep and the material is to the top of the curb. I would say that we've got something in there that's 18 inches deep.

Q . . . All right. Do you think that the users understand that?

A Well, how would they, they wouldn't even know how deep it is.

Q They have no idea with regards to the depth of the surfacing?

A Exactly.

CP at 131. Further, Mr. Thompson stated in his declaration:

The lack of sufficient surfacing is a condition not recognized or appreciated by the class of users at the Red Wagon which includes children, the disabled, and adults who frequent this attraction or supervise their children. Surfacing material, in this case woodchips, is not transparent. Therefore, *the actual depth of the material cannot be known by the user.* In Riverfront Park the perimeter of the slide area has woodchips at a greater depth than that at the end of the slide. So the user is given a false impression of greater depth than what actually exists. Specifically the user approaches the slide across 9 to 12 inches of surfacing material but exits the slide onto 2 inches of material. *Further, the user cannot determine the actual depth of the containment pit that is now filled with woodchips. They were not present and were not part of the site construction. There are no visible references to use accurately to determine if the surfacing is of sufficient depth. This information is however*

*available to the City and they can make a visual determination as to the appropriate level of the safety surfacing.*

CP at 75-76 (emphasis added).

¶38 The Swinehart' argument incorrectly focuses on a recreational user's knowledge of the depth of the containment pit rather than on whether the playground fill, including any displacement of the wood chips, was obvious. This oversight is problematic for three reasons.

¶39 First, this argument fails to recognize that park visitors are able to determine whether the wood chips have been displaced, despite the fact that they may not know with absolute certainty how deep the containment pit is. By making a visual reference to the fill level in other areas of the containment pit, visitors are able to make a determination as to whether an appropriate level of playground fill exists at the bottom of the slide before choosing to go down. The Swineharts' own playground safety expert, Mr. Thompson, after noting that the depth of the wood chips at the slide exit was 2½ inches, stated, "A few feet further from the slide the surfacing depth gradually began to increase from 6" to 12" near the sidewalk some 9' from the slide." CP at 73. In his declaration, Mr. Thompson further observed:

> At the slide exit region [the surfacing material] was widely dispersed and a large pit or depression served as the landing area rather than a level surfacing area. There was a loose rubber mat that had moved away from the immediate slide area.
>
> . . . .
>
> . . . The condition of the surfacing material throughout the site, with deep pits of displaced material, thick layers of compressed fines and *piles of loose surfacing around the stair access and under the elevated platform,* is evidence of a lack of periodic maintenance at the facility.

CP at 73-74 (emphasis added).

¶40 Mr. Thompson concluded that the wood chips had not received sufficient maintenance for at least one year prior to the injury. Therefore, assuming that the condition of the wood chips on the date of the incident was as poor as

the inspection two months later revealed, the displacement of the wood chips and the "large pit or depression" at the slide's landing area would have been obvious to any user of the slide and playground.

¶41 Second, the integrity of the playground fill would also have been readily apparent to recreational users. Mr. Thompson found that the wood chips were highly compacted throughout the Red Wagon site and "came out in compressed chunks." CP at 74. Mr. Thompson stated that a 1-inch layer of compressed sawdust material "was evident just under the top layer of loose woodchips," which was a mere one-quarter-inch deep. CP at 74. Mr. Thompson further noted that the underlying wood chips were black, moldy, and had turned into compressed mulch. Recreational users of the playground can reasonably be expected to differentiate between a compacted and deteriorating surface and loose material, because they are different in feel and appearance, and therefore obvious.

¶42 Most significantly, the Swineharts argue that photographs taken of the slide exit the day after the accident reveal the poor condition of the wood chips. The Swineharts state in their memorandum in support of summary judgment that "[t]he photographs taken by Mrs. Swinehart shortly after this incident reveal a poorly maintained surface at the slide exit and no reasonable juror could refute this evidence." CP at 62. Through this statement, the Swineharts seemingly acknowledge that the condition of the wood chips was visible and obvious at the time of the accident or such a condition could not have been captured by a photograph. An obvious defect cannot be latent. *Tabak*, 73 Wn. App. at 698.

¶43 Finally, the Swineharts contend that "[t]he classes of recreational users as identified by the City are not concerned, let alone capable, of appreciating the integrity of the playground surfacing or the varying levels of loose fill material within the containment pit at the Red Wagon slide." Br. of Appellant at 11. The City's representative, Mr. Bressler, stated that the Red Wagon was designed to draw children as well as adults to the playground. And the

playground fill was designed to make the area wheelchair accessible.

¶44 Here, the Swineharts mistakenly argue that a condition is latent if the identified class of recreational users are unable to appreciate or otherwise recognize the significance of the condition or the level of the wood chips within the containment pit. The recreational use statute has no such requirement. Moreover, the standard is not whether recreational users are concerned with or have an interest in the playground condition. This argument appears to focus on the inability of a child to be aware of or appreciate the dangers associated with a defective playground condition. For purposes of the statute, a latent condition is simply one which is "not readily apparent" to the recreational user. *Van Dinter*, 121 Wn.2d at 45. "[U]nder the recreational use statute, the question is whether the *injury-causing condition*—not the specific risk it poses—is readily apparent to the ordinary recreational user." *Ravenscroft*, 136 Wn.2d at 925. Moreover, whether a particular user discovered or failed to discover the condition is irrelevant to the court's inquiry. *Widman*, 81 Wn. App. at 114.

¶45 In conclusion, the condition of the playground fill at the Red Wagon slide exit was obvious to park visitors. The trial court correctly determined that the City was entitled to the benefit of immunity under the recreational use statute.

¶46 Accordingly, we affirm.

SWEENEY and KORSMO, JJ., concur.