# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CARL W. SCHWARTZ and SHERRY SCHWARTZ, individually and the marital community composed thereof<br><br>Appellants,<br><br>v.<br><br>KING COUNTY, a local governmental entity and municipal corporation within the state of Washington,<br><br>Respondent. | No. 53588-2-II<br><br><br><br>PUBLISHED OPINION |

MELNICK, J. — Carl Schwartz suffered a tragic injury while riding his bicycle. The incident occurred when Schwartz struck a bollard[1] on a trail in a park owned by King County. Schwartz sued the County. The County claimed immunity under the recreational use immunity statute,[2] and moved for summary judgment. The trial court granted the County's motion.

Schwartz argues that the County was not entitled to summary judgment based on recreational use immunity because genuine issues of material fact exist. First, he contends that genuine issues of material fact exist as to whether the trail was used predominately for transportation or recreation. Second, he argues that genuine issues of material fact exist as to whether the County had the authority to close the Green River Trail (GRT). Finally, he contends

---

[1] Bollards are short posts used to stop vehicles from entering the trail. *See Camicia v. Howard S. Wright Constr. Co.*, 179 Wn.2d 684, 688, 317 P.3d 987 (2014).

[2] RCW 4.24.210.

that genuine issues of material fact exist as to whether the County charged a fee to use the trail.  In the event we disagree, then Schwartz argues that genuine issues of material fact exist as to whether the known dangerous artificial latent condition exception to recreational use immunity applies.  RCW 4.24.210(4)(a).

We conclude that a genuine issue of material fact exists as to whether the bollard constituted an exception to recreational use immunity as a dangerous condition and as a latent condition.  We reverse.

## FACTS[3]

### I. INCIDENT

On March 13, 2017, Schwartz rode his bicycle south on the GRT in Cecil Moses Memorial Park when he struck a bollard.  The white bollard was four inches wide and had a red reflector on both the north and south side of it.

Schwartz, an experienced bicyclist, rode several thousand miles every year.  Since 2010, he had ridden on the GRT "a few dozen times or more."  Clerk's Papers (CP) at 968.  As a result of the accident, Schwartz was rendered a quadriplegic.

### II. THE GREEN RIVER TRAIL (GTR)

The GRT is a 19-mile trail that runs from Cecil Moses Memorial Park in Tukwila to Kent.  At the north end of Cecil Moses Memorial Park, adjacent to the trail, a sign titled "Trail Rules" states: "Trail is closed 1/2 hour after sunset and opens 1/2 hour before sunrise."  CP at 1018, 1023.

The GRT is used for both recreational and nonrecreational purposes, including commuting.  When the County created the GRT master plan in 1988, it understood that "the trail [would] be used for daily commuting as well as for recreation."  CP at 1264.

---

[3] Where the facts are written in the present tense, they are the facts as existed at summary judgment.

Although the County does not own the entire GRT, it does own the portion of the GRT that runs through Cecil Moses Memorial Park. The County acquired ownership of Cecil Moses memorial Park through 14 parcel and road vacations. It did not charge the public a fee to use the park.

III. THE COUNTY'S REGIONAL TRAIL SYSTEM (RTS)

A. Overview

The GRT is a part of the County's RTS, which consists of 175 miles of trails. The County estimates that pedestrians and bicyclists make approximately 12 million trips on the RTS each year.

The County manages the RTS as a park facility. The County has also described itself as a "steward[]" of the RTS. CP at 178.

The County originally intended the RTS to serve "as recreational amenities and linear parks." CP at 1441. However, the County also intended the RTS to integrate nonmotorized transportation, including bicycles, into the County's transportation system.

In 2012, the County published its "*Report of the King County Parks Levy Task Force*". CP at 1623. The report stated that the RTS "serves as an increasingly important alternative to traditional means of commuting." CP at 1624-25. But, in the County's 2016 comprehensive plan, it recognized the primary purpose of the RTS continued to be recreation.

In 2013, Robert Foxworthy, the County's Regional Trails Coordinator, wrote a memorandum regarding how the RTS interacted with the Americans with Disabilities Act of 1990. Foxworth stated that the RTS's trails are considered shared-use paths, which are "multi-use paths designed primarily for use by bicyclists and pedestrians . . . for transportation and recreation purposes." CP at 1662, 1664. Foxworthy also stated that the trails on the RTS are considered

public rights-of-way, which are defined as "[p]ublic land acquired for or dedicated to transportation purposes." CP at 1664.

In the County's 2017 program policies, it stated that "[r]egional trails should be accessible . . . for recreation and utility uses such as home-to-work or other 'commute' type trips," noting "the importance of the RTS being available when people want or need it—provides for 24 hour use." CP at 2739.

B.      Bollards on the RTS

The County installed bollards, including the bollard that Schwartz struck, to prevent cars from driving onto the trails.

In 2008, Foxworthy wrote an e-mail stating the County "should begin thinking about painting diamond warning stripes around the bollards on [the County's] paved trails." CP at 1950. In 2009, the County proposed new guidelines that would have required all new bollards to have such markings, but it never implemented them. The *Manual on Uniform Traffic Control Devices* (MUTCD), issued by the Federal Highway Administration (FHWA), and the American Association of State Highway and Transportation Officials both recommend yellow pavement markings leading up to and around bollards. The MUTCD applies to the GRT where Schwartz was injured.

The FHWA recognizes that bollards can present hazards: "Even 'properly' installed bollards constitute a serious and potentially fatal safety hazard to unwary trail users." CP at 1097. Therefore, "bollards should never be a default treatment, and should not be used unless there is a documented history of intrusion by unauthorized cars, trucks, or other unauthorized vehicles." CP at 1097.

4

The County has received complaints from cyclists regarding bollards on the RTS. For example, in 2014, the County received a complaint where the citizen alleged that she had "suffered catastrophic injuries" as a result of striking a bollard that she did not see. CP at 1944. The complaints were not specific to the bollard that Schwartz struck, and the County did not know of any reports of injuries sustained from that specific bollard.

However, in 2009, someone painted the word "post" and a squiggly line on the asphalt on both approaches to the bollard that Schwartz struck. Stephanie Johnson, a former County parks and recreation employee, stated that she was present when another employee told their boss about the painted words and squiggly lines, but he took no action.

C.      Federal Funding

The Puget Sound Regional Council (PSRC) "is designated under federal law as the Metropolitan Planning Organization (required for receiving federal transportation funds) and under state law as the Regional Transportation Planning Organization for King, Kitsap, Pierce and Snohomish counties." CP at 2466. In 2010, PSRC calculated that it "distribute[d] about $160 million a year to transportation projects." CP at 2466.

"Since 1991, a major source of funding for acquisition and development of [the] County's regional trails," including the GRT, "has come from the federal appropriation for the national transportation programs." CP at 1290. The County applies to the PSCR to obtain the federal aid in the form of grants. The GRT itself has received two of these grants, and as recently as 2017, the County sought federal transportation funds from PSRC to improve the GRT.

The PSCR's 2018 "*Regional Transportation Plan*" included a number of planned or requested projects for the GRT. CP at 2508-11. One project was located near, but not within, Cecil Moses Memorial Park.

5

Foxworthy has stated that if the County obtains federal transportation funds, then trails "should be available 24 hours [a day] as a public transportation facility." CP at 2770.

IV.    LAWSUIT

As a result of his injury, Schwartz sued the County alleging, among other claims, negligence. The County argued it had recreational use immunity, RCW 4.24.210.

During discovery, Schwartz deposed Sam Whitman, the County's Park District Maintenance Coordinator, and Foxworthy.

Whitman stated that he knew of one occurrence in the previous few years where a race occurred on the GRT. The race was a long-distance bicycle ride that "utilized a portion of the [GRT]." CP at 2843. Whitman said a private group hosted the race and had to have a permit to hold the event. He believed the group had to pay for the permit.

Foxworthy admitted that the County knew that the public used the RTS at all hours, regardless of the posted hours. He also stated that the County had a long-standing proposal, to be implemented in the future, to keep the RTS open 24 hours a day.

Schwartz moved to dismiss the County's recreational use immunity defense based on the recreational use statute and this court's decision in *Lockner v. Pierce County*, 198 Wn. App. 907, 396 P.3d 389 (2017), *rev'd*, 190 Wn.2d 526, 415 P.3d 246 (2018). The County opposed Schwartz's motion, and the court denied it.

After the Supreme Court issued *Lockner*, the County moved for summary judgment. In its brief, the County disputed that the bollard was known, dangerous, artificial, or latent.[4]

---

[4] As discussed below, an exception to recreational use immunity applies to "injuries sustained to users by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted." RCW 4.24.210(4)(a).

Schwartz opposed the motion. He argued that genuine issues of material fact existed as to whether the County satisfied the recreation use immunity statute and that further issues of fact existed as to whether the known dangerous artificial latent condition exception applied. For support, Schwartz relied on the declarations of Colleen Sheehan, Stephanie Johnson, James Sobek, and Joellen Gill.

Sheehan, a former employee of the County's Park and Recreation Department, testified that the "predominate use of the section of the GRT that runs through Cecil Moses Memorial Park is by people using this trail for transportation and/or commuting purposes." CP at 1136, 1145.

Johnson admitted that it was obvious the painting of the word "post" around the bollard existed to warn users about it. CP at 1116. Johnson also stated that the "bollard was not easily detectable or readily apparent to people using the trail, especially bicyclists." CP at 1117. Johnson "considered the bollard to be dangerous." CP at 1117.

Sobek, an expert regarding visibility and conspicuity, testified that a bicyclist would have difficulty seeing the bollard because of the contrast of the bollard and the path. Sobek explained how under certain conditions the bollard appeared light against a darker roadway, while under other conditions it appeared dark against a lighter roadway. Sobek stated that for these to both be true, when the light is shifting from one condition to the other, there is a point in time where the bollard is nearly invisible.

Sobek also noted how the bollard did not comply with federal guidelines regarding markings on bollards. Sobek concluded "that the GRT bollard was not readily apparent to someone coming in contact with it in certain conditions, and therefore constitute[d] an artificial and dangerous latent condition on the trail." CP at 1087.

Gill, an expert in human factors, engineering, safety, and risk management, similarly testified that the bollard "was likely not capable of being physically seen at the time [of Schwartz's injury] by a normal user of the trail or a cyclist." CP at 1067.

The court held a hearing on the County's motion. At the hearing, the County stated: "For purposes of our motion, we are prepared to concede the other elements [of the known dangerous artificial latent condition exception]; latency is the element that [the] County is not willing to concede." Report of Proceeding (RP) (Aug. 3, 2018) at 9.

The court granted the County's motion. In its oral ruling, the court stated:

> And I'll be curious to know the outcome [of this case on appeal] because whether it's Justice [Gonzàlez] or Justice Stephens or perhaps Justice Madsen that reconcile *Camicia* and *Lockner*, someone's got to do it, I think. And it's interesting to me that in essence it was a unanimous decision in *Lockner*.
>     . . . .
> . . . I would hope that this might bypass Division II. Maybe I shouldn't have said that for the record. I only say that because I think ultimately it would have to be decided by the Supreme Court, given *Lockner* and *Camicia* and *Jewels*[5].

RP (Aug. 3, 2018) at 31-32. Schwartz sought direct review by the Supreme Court. The court transferred the case to this court. We conclude that material factual issues are in dispute.

## ANALYSIS

### I.    RECREATIONAL USE IMMUNITY

Schwartz argues that the court erred in granting summary judgment in favor of the County based on recreational use immunity. First, Schwartz contends that genuine issues of material fact exist as to whether the GRT is used for the sole purpose of recreation. Second, Schwartz argues that genuine issues of material fact exist as to whether the County holds the GRT open to the public, when it is used primarily for transportation and thus the County cannot close it. Lastly,

---

[5] *Jewels v. City of Bellingham*, 183 Wn.2d 388, 353 P.3d 204 (2015).

Schwartz argues that genuine issues of material fact exist as to whether the County charges a fee to use the GRT.

A.    Legal Principles

We review an order for summary judgment de novo, performing the same inquiry as the trial court. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006). "We consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party." *Rublee v. Carrier Corp.*, 192 Wn.2d 190, 199, 428 P.3d 1207 (2018). "Summary judgment is proper when the record demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Munich v. Skagit Emergency Commc'n Ctr.*, 175 Wn.2d 871, 877, 288 P.3d 328 (2012).

The legislature enacted Washington's recreational use immunity statute, RCW 4.24.210,[6] to encourage landowners to make their lands available to the public for recreational purposes by limiting their liability toward users of those lands. RCW 4.24.200. In relevant part, the statute provides:

> [A]ny public or private landowners . . . who allow members of the public to use [the land] for the purposes of outdoor recreation, which term includes, but is not limited to, . . . bicycling, . . . without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users.

RCW 4.24.210(1). Thus, "[t]o qualify for immunity under RCW 4.24.210, the landowner must establish that the land at issue was (1) open to members of the public (2) for recreational purposes and that (3) no fee was charged." *Lockner*, 190 Wn.2d at 532. The parties dispute each element. This decision addresses them slightly out of order, switching the first two elements.

---

[6] The recreational use statute was amended after Schwartz suffered his injury. LAWS OF 2017, ch. 245, § 1. Because this amendment is not relevant here, this decision cites to the current version of this statute.

"Because recreational use immunity is an affirmative defense, the landowner asserting it carries the burden of proving entitlement to immunity under the statute." *Camicia v. Howard S. Wright Constr. Co.*, 179 Wn.2d 684, 693, 317 P.3d 987 (2014).

B.      Was the GRT Opened for Recreational Purposes?

Schwartz relies on *Camicia* and argues that, to satisfy the recreational use immunity statute, a use must be predominantly or primarily used for recreation.

The County relies on *Lockner* to argue that the land need only be available for recreational purposes, even if it is also used for other purposes. We agree with the County.

In *Camicia*, the plaintiff struck a bollard on the Interstate I-90 bicycle trail located in the City of Mercer Island. 179 Wn.2d at 687. The trail existed for both transportation and recreational purposes. *Camicia*, 179 Wn.2d at 688-89.

The plaintiff sued the city which moved for summary judgment. The city argued it had immunity from liability based on the recreational use immunity statute. *Camicia*, 179 Wn.2d at 687. The trial court granted the city's motion. *Camicia*, 179 Wn.2d at 687.

On appeal, the court "reject[ed] the City's view that recreational immunity follows from the mere presence of incidental recreational use of land that is open to the public." *Camicia*, 179 Wn.2d at 697. Instead, the court looked to the purpose of the statute and stated:

> Extending the reach of RCW 4.24.210 to land that is open to the public for purposes other than recreation simply because some recreational use occurs not only undermines the statute's plain language and the legislature's intent but would also unjustly relieve the government of its common-law duty to maintain roadways in a condition reasonably safe for ordinary travel.

*Camicia*, 179 Wn.2d at 699. Therefore, the court concluded that summary judgment was inappropriate and it reversed the trial court. *Camicia*, 179 Wn.2d at 702-03.

10

In *Lockner*, the plaintiff fell from her bicycle on the Foothills Trail, which Pierce County maintained. 190 Wn.2d at 528-29. She sued the county for negligence, and the county moved for summary judgment based on recreational use immunity. *Lockner*, 190 Wn.2d at 530. The trial court granted the county's motion. *Lockner*, 190 Wn.2d at 530.

On appeal, the plaintiff alleged that the only dispute of material fact was "whether genuine issues of material fact exist as to whether the trail was open solely for recreational use." *Lockner*, 190 Wn.2d at 532. Thus, the court determined that the case involved only a question of law as to whether RCW 4.24.210 required that recreation be the sole use. *Lockner*, 190 Wn.2d at 532.

The court held that it does not because it refused to read the word "solely" into the statute where the legislature had not included it. *Lockner*, 190 Wn.2d at 533. The court stated that it was not overruling *Camicia* and that *Camicia* was not contrary to its holding. *Lockner*, 190 Wn.2d at 534. The court explained:

> [In *Camicia*,] this court determined that summary judgment was improper because there were factual disputes as to whether the I-90 trail was open for recreation at all or solely for transportation purposes. Critical to our holding was a deed transferring ownership of the I-90 trail to the city. The deed specifically provided that the trail could be used for "road/street purposes only" with other uses allowed upon written approval of the transferrer. Viewed in a light most favorable to the plaintiff, the deed suggested the city could not close the trail to transportation and a fact finder could infer the trail would be open for transportation regardless of any recreational use. Whether the trail could be used for recreation was a disputed fact that consequently precluded determining the legal question of whether recreational immunity was applicable. We remanded the case to the trial court. Our holding in *Camicia* is clear: where evidence conflicts regarding whether the land is open for recreational use, the case must go before a finder of fact. The land in *Camicia* was used primarily for transportation. If sole recreational use was required, remand would have made no sense.

*Lockner*, 190 Wn.2d at 534 (citations omitted).

11

The court concluded that recreational use immunity "is not extinguished when land is used for other public or private activities in addition to recreation." *Lockner*, 190 Wn.2d at 534. The court recognized that the Foothills Trail at issue was "described in one website as a popular commuter route and recreational destination," but concluded that this fact did "not establish that the County *intended* the land to be used exclusively for transportation." *Lockner*, 190 Wn.2d at 536 (internal quotation marks omitted).

Thus, under *Lockner*, the inquiry is whether GRT was used for recreation, regardless of whether it also is used for other purposes. *See* 190 Wn.2d at 534. People clearly used the GRT for recreational purposes. Schwartz's argument is premised on a legal theory that more is required. Under *Lockner*, nothing more is required. Therefore, we conclude that the County satisfied the for-recreational-purposes element.

C.      Was the GRT Open to Members of the Public?

Schwartz argues that whether the GRT was "open to the public" depends on whether the County had the authority to permanently close the GRT. The County argues the relevant inquiry is whether it could close the portion of the GRT where Schwartz's injury occurred. We agree with the County.

1.      Legal Principles

"A landowner has 'lawful possession and control' over land if it holds 'continuing authority to determine whether the land should be open to the public.'" *Camicia*, 179 Wn.2d at 696 (quoting *Tennyson v. Plum Creek Timber Co.*, 73 Wn. App. 550, 557-58, 872 P.2d 524 (1994)). "A landowner must have authority to close the land to the recreating public because extending recreational immunity to landowners who lack authority to close the land to the public 'would not

further the purpose behind the act.'" *Camicia*, 179 Wn.2d at 696 (quoting *Tennyson*, 73 Wn. App. at 558).

Regarding this element, the parties' dispute presents two issues. The first relates to the relevant portion of the trail that the County must have the authority to close and whether it must be the entire GRT or a portion of it. The second relates to whether the County must have the authority to permanently close the relevant portion of the GRT or to establish times when it is open.

### 2. Relevant Portion of GRT

Schwartz argues that, to qualify for recreational use immunity, the County must have the authority to close the entire GRT, which it did not have. The County argues that the relevant portion of the GRT, for purposes of recreational use immunity, is the portion in Cecil Moses Memorial Park where Schwartz was injured. We agree with the County.

As discussed further below, to qualify for recreational use immunity, landowners cannot charge a fee for the use of their land. RCW 4.24.210. Washington courts have stated a landowner can "charge a fee for public use of *a portion* of its recreational land without losing immunity for public use of the remainder." *Plano v. City of Renton*, 103 Wn. App. 910, 914, 14 P.3d 871 (2000) (emphasis added).

Thus, for the charging-a-fee element, courts look to location of where the injury occurred. A landowner who charges a fee for a different portion of the land does not result in a loss of immunity for the portion of the land where it does not charge a fee.

Therefore, we conclude that the relevant inquiry for the authority-to-close element is whether the County had the authority to close the portion of the GRT where Schwartz's injury occurred.

13

3.     Duration of Closure

Schwartz argues that for the County to have the authority to close, it had to have the authority to close the GRT permanently, which it did not have. The GRT was a public right of way where citizens could access the trail for transportation purposes regardless of the County's posted hours.

The County argues that it had the authority to close the GRT because it could set hours of operation, which it had at the time of Schwartz's injury. We conclude that the County could close the portion of the GRT where Schwartz's injury occurred.

In *Camicia*, the court concluded that genuine issues of material fact existed as to whether the city had the authority to close the trail to public transportation. The court noted that Washington State Department of Transportation (WSDOT) had "conveyed the land under a deed that limit[ed] its use to 'road/street purposes only' absent 'prior written approval of the grantor.'" *Camicia*, 179 Wn.2d at 697. Additionally, the court recognized that WSDOT's "documents indicate[d] that the . . . trail [was] part of a multimodal transportation facility." *Camicia*, 179 Wn.2d at 697.

The County contends that *Lockner* rejected the requirement that the "authority to close" prong requires that a landowner be able to permanently close the land. Br. of Resp't at 16 (internal quotation marks omitted). The County contends that *Lockner* approved of establishing time limits as sufficient to establish a landowner's authority to close. However, contrary to the County's argument, *Lockner* explicitly chose not to rule on the applicability of the authority-to-close test:

14

> Neither Lockner nor the County asked this court to consider the "authority to close" test, and we did not grant review of this issue. Moreover, it is unnecessary for resolution of the issues properly before the court because the County demonstrated its continuing authority to close the Foothills Trail to the public. Because the authority to close test is not squarely presented, we decline to consider it.

190 Wn.2d at 535 n.2.

Nonetheless, we conclude that the County had the authority to close the portion of the GRT in Cecil Moses Memorial Park where Schwartz was injured. The County owned Cecil Moses Memorial Park and the portion of the GRT that ran through it. The County acquired the park through 14 parcel and road vacations.

The County can "promulgate rules setting forth the times and conditions upon which the county parks and recreation facilities will be open, closed, or used by the public." King County Code (KCC) 7.12.030. It can also designate off-limits areas. KCC 7.12.035. Given the County's ownership and regulations governing its parks, Schwartz has not shown what would prevent the County from closing the park.

Schwartz argues that the County could not close the GRT because portions of it had received federal transportation funds in the past. He argues that a condition of receiving federal transportation funds is that the land be held open for transportation purposes at all times. However, even assuming Schwartz's second point is correct, he has not shown that the portion of the GRT in Cecil Moses Memorial Park has ever received federal transportation funding. The record does not indicate that it has.

Thus, because the County owned the park and the portion of the GRT that ran through it, we conclude that no genuine issues of material fact exist as to whether the County had the authority to close it.

D.      Did the County Charge a Fee?

Schwartz contends that the County has previously rented out the GRT for a race, and charged a fee for the race permit. Schwartz argues that this rental and associated fee raises a genuine issue of material fact as to whether the County charges a fee to use the GRT. We disagree.

In *Plano*, the city owned and maintained a park, which had a dock on it. 103 Wn. App. at 910-11. The city did not charge a fee to enter the park or use most of the park's facilities, but it did charge an overnight moorage fee. *Plano*, 103 Wn. App. at 912. Moorage was free during the day for up to four hours. *Plano*, 103 Wn. App. at 912. A sign stated that the city enforces the moorage regulations and that violators were subject to a fine and impound. *Plano*, 103 Wn. App. at 912-13. The plaintiff moored her boat for two nights and complied with the city's overnight moorage regulations. *Plano*, 103 Wn. App. at 913. On the third day, while walking on the dock's ramp, the plaintiff fell and injured herself. *Plano*, 103 Wn. App. at 911.

The court concluded that "the ramp where the injury occurred [was] in the recreational area for use of which [the city] charge[d] a fee." *Plano*, 103 Wn. App. at 915. As a result, the city was not immune from suit under recreational use immunity. *Plano*, 103 Wn. App. at 916.

In *Hively v. Port of Skamania County*, 193 Wn. App. 11, 13, 372 P.3d 781 (2016), the port owned a park, which was connected to two other port properties by an asphalt path. There was a restroom along the path. *Hively*, 193 Wn. App. at 13. While walking on the path, the plaintiff fell and injured himself. *Hively*, 193 Wn. App. at 13.

The port did not charge a fee to use the park or the two other properties. *Hively*, 193 Wn. App. at 13. The port, however, did occasionally rent the entirety of one of the parks to private parties for a fee, and charged cruise ships a fee to dock at the landing. *Hively*, 193 Wn. App. at

16

13. The path in question remained open to the public while the park was rented. *Hively*, 193 Wn. App. at 13.

*Hively* distinguished *Plano* because, in *Hively*, "[a] person [was] not *required* to pay for or use either the path or the restroom as a part of any paid access for or use of [the park]." 193 Wn. App. at 16. Additionally, "[n]o evidence suggest[ed] that the path where [the plaintiff's] injury occurred was constructed specifically for the purpose of providing access to the Port's fee-generating areas." *Hively*, 193 Wn. App. at 16. Therefore, the court concluded that the port was entitled to recreational use immunity because, for the purposes of the statute, it did not charge a fee. *Hively*, 193 Wn. App. at 17.

In this matter, during Whitman's deposition, he admitted that he knew of one instance in the last few years where a race occurred on the GRT. A private group hosted the race, and the group was required to get a permit to hold the event. Whitman believed the group had to pay for the permit. Whitman's belief is supported by County regulations. *See* KCC 7.12.040 ("The manager [of the County's Department of Natural Resources and Parks] may issue permits to community groups or persons to meet or conduct activities in the parks and recreation facilities . . . . The director *shall* charge the applicable user fee for the use permitted under the permit." (Emphasis added.)). Whitman confirmed that the race "utilized a portion of the [GRT]." CP at 2843.

It is unclear whether the race used the portion of the GRT in Cecil Moses Memorial Park. Additionally, it is unclear whether the path remained open to the public during the race. However, because the issue is whether the trial court properly granted the County's motion for summary judgment, we must view the evidence in the light most favorable to Schwartz. Furthermore, "[b]ecause recreational use immunity is an affirmative defense, the landowner asserting it carries

the burden of proving entitlement to immunity under the statute." *Camicia*, 179 Wn.2d at 693. Therefore, we view the evidence such that the race did occur on the portion of the GRT that ran through Cecil Moses Memorial Park, that the public was excluded during the race, and that the County charged the private party a permit fee to hold the race.

This evidence, however, is not enough to prevent the County from successfully asserting recreational use immunity. It stretches credulity that a permit fee for one race could render the stretch of the GRT in Cecil Moses Memorial Park a "fee generating area" that vitiates, in perpetuity, the County's recreational use immunity.

In *Plano*, the fee generating area was a dock that charged moorage fees to all boats docking overnight. 103 Wn. App. at 912. In *Hively*, the fee generating areas were a landing that charged fees to docking cruise ships and the entirety of one of the parks that was rented out for private events. 193 Wn. App. at 13. Neither is comparable to a single permit fee for a single race. Furthermore, like *Hively* and unlike *Plano*, there is no evidence that a person was required to pay a fee for use of the area where Schwartz's injury occurred.

Accordingly, we conclude that there is no genuine issue of material fact as to whether the County charges a fee to use the GRT.

Because recreational immunity applies, we must next determine if an exception applies.

## II.    EXCEPTION TO RECREATION USE IMMUNITY

Schwartz argues that genuine issues of material fact exist as to whether the bollard was a known dangerous artificial latent condition, which is an exception to recreational use immunity. We agree.

A. Legal Principles

Even if a landowner satisfies the elements of the recreational use immunity statute, he or she cannot assert recreational use immunity "for injuries sustained to users by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted." RCW 4.24.210(4)(a). Known, dangerous, artificial, and latent all modify the term condition, not each other. *Jewels v. City of Bellingham*, 183 Wn.2d 388, 390, 353 P.3d 204 (2015).

B. Waiver

Schwartz argues that, because the County conceded the known and dangerous elements at oral argument before the trial court, it waived its arguments for those elements. We disagree.

Under RAP 2.5(a), we "may refuse to review any claim of error which was not raised in the trial court." *See also* RAP 9.12 ("On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court.").

Schwartz cites *City of Oak Harbor v. St. Paul Mercury Insurance Co.*, 139 Wn. App. 68, 159 P.3d 422 (2007), to support his argument that the County waived the issues. However, in that case, the plaintiff conceded a point in its briefing before the trial court, and the court refused to allow the plaintiff to argue that point on appeal. *City of Oak Harbor*, 139 Wn. App. at 72-73.

Here, in its briefing before the trial court, the County argued that the bollard was not known or dangerous. But at oral argument, the County stated: "For purposes of our motion, we are prepared to concede the [known, dangerous, and artificial] elements; latency is the element that [the] County is not willing to concede." RP (Aug. 3, 2018) at 9.

19

We conclude that the County preserved its arguments. Although it conceded the known and dangerous elements at oral argument before the trial court, it sufficiently raised and argued those elements in its briefing.

C.    Known

A landowner "must have actual knowledge that the condition *exists*; the [landowner] does not need to know that the condition is dangerous." *Jewels*, 183 Wn.2d at 401.

The evidence shows that the County knew that the bollard existed. The County owned Cecil Moses Memorial Park and the portion of the GRT that runs through it, and the County installed the bollard that Schwartz struck. Therefore, we conclude that genuine issues of material fact do not exist as to whether the County knew the bollard existed.

D.    Dangerous

Typically, in interpreting statutes, our "starting point is always the statute's plain language and ordinary meaning." *Jewels*, 183 Wn.2d at 394. "Courts often look to standard dictionaries to determine the ordinary meaning of words." *Ravenscroft v. Wash. Water Power Co.*, 136 Wn.2d 911, 922, 969 P.2d 75 (1998) (looking to the dictionary definition of "artificial" in interpreting the known dangerous artificial latent condition exception). Dangerous is defined as "demanding caution or care as extremely unsafe," or "able or likely to inflict injury or harm." WEBSTER'S THIRD INT'L DICTIONARY 573 (2002).

However, some Washington courts have defined the term dangerous "in terms of common law negligence, namely, a condition that poses an unreasonable risk of harm." *Gaeta v. Seattle City Light*, 54 Wn. App. 603, 609, 774 P.2d 1255 (1989), *abrogated on other grounds by Jewels*, 183 Wn.2d 388.

We conclude that, under either definition, genuine issues of material fact exist as to whether the bollard that Schwartz struck was dangerous. First, the very nature of Schwartz's injury indicates that the bollard is dangerous. Schwartz's collision with the bollard rendered him a quadriplegic.

Second, Schwartz presented evidence that showed someone had written the word "post" and drew lines around the bollard that he later struck. A reasonable interpretation from this evidence is that at least one other person had struck the bollard and had been injured by it, such that they felt compelled to warn others.

Third, Schwartz presented evidence that other people had been injured by bollards on the RTS. In 2014, a citizen wrote to the County that she had struck a bollard and had "suffered catastrophic injuries" as a result. CP at 1944.

Finally, Schwartz presented evidence that the FHWA recognizes bollards' inherent danger, stating that "[e]ven 'properly' installed bollards constitute a serious and potentially fatal safety hazard to unwary trail users." CP at 1097. "[B]ollards should never be a default treatment, and should not be used unless there is a documented history of intrusion by unauthorized cars, trucks, or other unauthorized vehicles." CP at 1097.

Therefore, we conclude that a genuine issue of material fact exists as to whether the bollard that Schwartz struck was a dangerous condition.

E. Latent Condition

In *Ravenscroft*, 136 Wn.2d at 915, the plaintiff suffered an injury after the boat in which he was riding struck a submerged tree stump. One issue involved whether the submerged tree stump constituted a latent condition. The court concluded that genuine issues of material fact existed as to whether the stumps were readily apparent, i.e., obvious and not latent. *Ravenscroft*,

21

136 Wn.2d at 925-26. The court noted that "the driver of the boat testified . . . that the submerged stumps were not apparent to him" and that other people had hit the stumps in the past, "indicating they were not readily apparent." *Ravenscroft*, 136 Wn.2d at 925.

In *Jewels*, the plaintiff rode his bicycle on a path through a park. 183 Wn.2d at 391. He attempted to avoid a painted speed bump by going around it and hit an unpainted asphalt berm. *Jewels*, 183 Wn.2d at 391-92. The plaintiff was thrown from his bicycle and suffered injury. *Jewels*, 183 Wn.2d at 392. The plaintiff claimed that the berm was latent because it "appeared to him to be 'bare, flat pavement.'" *Jewels*, 183 Wn.2d at 398.

The court recognized that "[t]he dispositive question [for latency] is whether the condition is readily apparent to the general class of recreational users, not whether one user might fail to discover it." *Jewels*, 183 Wn.2d at 398. The court then canvassed the case law on latency and derived the following principles:

> if an ordinary recreational user standing near the injury-causing condition could see it by observation, without the need to uncover or manipulate the surrounding area, the condition is obvious (not latent) as a matter of law. The latency of the condition is not based on the particular activity the recreational user is engaged in or the particular user's experience with the area from earlier visits or expertise in the specific recreational activity.

*Jewels*, 183 Wn.2d at 400.

In ruling, the court stated, "The condition itself, not the danger it poses, must be latent. The dipositive question is whether the condition is readily apparent to the general class of recreational users, not whether one might fail to discover it." *Jewels*, 183 Wn.2d at 398. The court "conclude[d] that any person could stand near the [berm] and see it." *Jewels*, 183 Wn.2d at 400. Therefore, it concluded that the berm was not latent as a matter of law. *Jewels*, 183 Wn.2d at 401.

Here, however, the unrebutted testimony of two experts, Sobek and Gill, raise a contested issue of material fact. They stated respectively, "that the GRT bollard *was not readily apparent*

22

to someone coming in contact with it in certain conditions" and it "was likely not capable of being physically seen at the time [of Schwartz's injury] *by a normal user of the trail* or a cyclist." CP at 1067, 1087 (emphasis added). The expert opinion also stated that because of changing conditions, the bollard appeared light against a darker roadway, while at other times it appeared dark against a lighter roadway. These conditions could make the bollard nearly invisible.

This case is factually different from *Jewels* because, unlike in *Jewels*, expert testimony in this case clearly establishes there is a material dispute of facts as to latency. "[L]atency is viewed objectively, and what a particular recreation user saw, believed, or thought he saw is immaterial." *Jewels*, 183 Wn.2d at 400.

The expert testimony in this case stated that "the GRT bollard was not readily apparent to someone coming in contact with it in certain conditions." CP at 1087. The expert testimony, along with other evidence, demonstrates that, under conditions as they appeared to Schwartz, a material issue of fact exists. Even if an ordinary recreational user stood next to the bollard, it could be latent. In addition, Johnson stated that the "bollard was not easily detectable or readily apparent to people using the trail, especially bicyclists." CP at 1117.

In consideration of Sobek's and Gill's testimony, and viewing the facts in the light most favorable to Schwartz, we conclude that there is a genuine issue of material fact as to whether any person standing near the bollard would be able to see it. Accordingly, when viewing the evidence in the light most favorable to Schwartz, there is a genuine issue of material fact as to whether the bollard was a latent condition.

Because there are genuine issues of material fact as to whether the bollard was known, dangerous, and latent, we conclude that genuine issues of material fact exist as to whether the bollard constituted a known dangerous artificial latent condition under RCW 4.24.210(4)(a).

CONCLUSION

Because there are genuine issues of material fact as to whether the bollard constituted a dangerous and latent condition under RCW 4.24.210(4)(a), we reverse the trial court's order granting summary judgment.

_____
Melnick, J.

I concur:

_____
Sutton, A.C.J.

WORSWICK, J. (concur in part and dissent in part) — Although I agree with the majority's decision that recreational immunity applies here, I disagree that there are genuine issues of material fact as to whether an easily photographed, painted bollard with a reflector on top presents a latent condition under RCW 4.24.210(4)(a). I would hold as a matter of law that the bollard was obvious. Therefore, I respectfully disagree with the majority's decision to reverse the trial court's order granting summary judgment.

In relevant part, RCW 4.24.210(4)(a) states that a landowner is entitled to recreational immunity unless there is a "known dangerous artificial latent condition." Each adjective—known, dangerous, artificial, and latent—modifies the term "condition." *Jewels v. City of Bellingham*, 183 Wn.2d 388, 391, 353 P.3d 204 (2015). The plaintiff must show that the condition satisfies each adjective, or else the landowner is entitled to immunity. *Jewels*, 183 Wn.2d at 391. Where latency is at issue, "[t]he dispositive question is whether the condition is readily apparent to the general class of recreational users, not whether one user might fail to discover it." *Jewels*, 183 Wn.2d at 398.

Five short years ago, our Supreme Court examined a similar scenario involving a bicycle accident. *Jewels*, 183 Wn.2d at 391. Jewels sued the city of Bellingham after hitting an unpainted asphalt berm in a city park. *Jewels*, 183 Wn.2d at 391-92. The court examined whether the injury-causing condition was latent, noting that "what one 'particular user sees or does not see is immaterial.' This is an *objective inquiry*." *Jewels*, 183 Wn.2d at 398 (emphasis added) (quoting *Widman v. Johnson*, 81 Wn. App. 110, 114-15, 912 P.2d 1095 (1996)).

In conducting this objective inquiry, the *Jewels* court discussed *Swinehart v. City of Spokane*, 145 Wn. App. 836, 187 P.3d 345 (2008). In *Swinehart*, the plaintiff was injured when wood chip material intended to cushion the landing of those sliding down a playground slide had become displaced from repeated landings. 145 Wn. App. at 840. Division Three of this court correctly concluded that the condition was not latent. *Swinehart*, 145 Wn. App. at 853. The Supreme Court in *Jewels* emphasized the circumstances in *Swinehart* as instructive in determining when a condition is obvious:

> [M]ost significantly, the plaintiff introduced a photograph taken at the slide's exit meant to reveal the poor condition of the wood chips. As the Court of Appeals aptly noted, this "seemingly acknowledge[s] that the condition of the wood chips was visible and obvious at the time of the accident *or such a condition could not have been captured by a photograph*. An obvious defect cannot be latent."

*Jewels*, 183 Wn.2d at 400 (emphasis added) (alteration in original) (quoting *Swinehart*, 145 Wn. App. at 852).

> From this, our Supreme Court laid out the following principles on latency:

> [I]f an ordinary recreational user *standing* near the injury-causing condition could *see it by observation*, *without the need to uncover or manipulate the surrounding area*, the condition is obvious (not latent) as a matter of law. The latency of the condition is *not* based on the particular activity the recreational user is engaged in or the particular user's experience with the area from earlier visits or expertise in the specific recreational activity.

*Jewels*, 183 Wn.2d at 400 (emphasis added).

The *Jewels* court held the berm was obvious as a matter of law, noting "[f]rom our review of the photographs in the record, we conclude that any person could stand near the water diverter and see it." 183 Wn.2d at 400. The *Jewels* case abrogated years of case law that had held a condition latent if it were "not readily apparent." *See, e.g.*, *Cultee v. City of Tacoma*, 95 Wn. App. 505, 521, 977 P.2d 15 (1999); *Tabak v. State*, 73 Wn. App. 691, 698, 870 P.2d 1014 (1994); *Gaeta v. Seattle City Light*, 54 Wn. App. 603, 609, 774 P.2d 1255 (1989).

26

We are bound by our Supreme Court precedent. *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 578, 146 P.3d 423 (2006). This case is no different than *Jewels*. In both cases, the defect is clearly depicted in a photograph. In both cases expert testimony claimed the defect was hazardous.

The bollard at issue here looked like this:



The bollard is 4 inches wide and several feet tall. It is painted white and has a red reflector on top. Based on the evidence, a person standing near the bollard could "see it by observation, without the need to uncover or manipulate the surrounding area." *Jewels*, 183 Wn.2d at 400. I would hold the bollard is obvious.

Contrary to *Jewels*, the majority subjectively assesses the bollard from the point of view of a person riding a bicycle, basing its holding on "conditions as they appeared to Schwartz." Majority at 23. The majority also notes that "[e]ven if an ordinary recreational user stood next to the bollard, it could be latent." Majority at 23. But this conclusion is negated by the photographs submitted by Carl Schwartz that clearly show the obvious bollard.

The fact that someone says a condition is difficult to see is not the test we are to apply. I would apply the rule from *Jewels* and hold that the bollard was visible and obvious at the time of

Schwartz's accident as evidenced by the photographs. As *Jewels* makes clear, if a condition can be photographed, it is not latent.

Because the condition in question can be photographed and was easily observed, I would hold that it is obvious, not latent. Accordingly, I would find the trial court did not err and would affirm its order granting King County summary judgment.

_____
Worswick, J.